John CONNOLLY and Anne
Molinari, Appellants

v.

David C. GASMIRE, Douglas B. Cannon, Brenda A. Belger, Deborah A. Hoffpauir, Kathleen A. Ventre, Mark A. Wan, Richard R. Burnham, Martin S. Rash, John K. Carlyle, David W. Cross, Paul J. Feldstein, Shawn S. Schabel, David L. Steffy, and Odyssey Healthcare, Inc., Appellees.

No. 05–06–01431–CV.

Court of Appeals of Texas,
Dallas.

July 2, 2008.

Balon B. Bradley, Balon B. Bradley & Carolyn A. Gil, Dallas, TX, Nadeem Faruqi, Shane Rowley, Beth A. Keller, Faruqi, Faruqi, L.L.P., New York, NY, Caroline A. Schnurer, Jeffery P. Fink, Robbins Umeda & Fink, L.L.P., Brian J. Robbins, San Diego, CA, for Appellant.

Kenneth P. Held, Houston, Karen L. Hirschman, Matthew R. Stammel, Thomas S. Leatherbury, Vinson & Elkins, L.L.P., Ken Carroll, David S. Coale, Carrington, Coleman, Sloman & Blumenthal, L.L.P., Dallas, TX, for Appellee.

Before Justices O'NEILL, RICHTER, and LANG.

## OPINION

Opinion by Justice LANG.

John Connolly and Anne Molinari appeal the trial court's order dismissing, without prejudice, their shareholder derivative lawsuit brought on behalf of Odyssey Healthcare, Inc., against Richard R. Burnham, Martin S. Rash, John K. Carlyle, David W. Cross, Paul J. Feldstein, Shawn S. Schabel, and David L. Steffy, who are members of Odyssey's board of directors, David C. Gasmire and Mark A. Wan, who are former members of the Odyssey board of directors, (collectively the Odyssey directors), and Douglas B. Cannon, Brenda A. Belger, Deborah H. Hoffpauir, and Kathleen A. Ventre, the officers of Odyssey (collectively the Odyssey officers).

Connolly and Molinari raise two issues arguing the trial court erred when it: (1) sustained the Odyssey directors and officers' special exceptions based on their assertion that Connolly and Molinari failed to state the necessary factual allegations to show demand futility; and (2) granted Odyssey's, and the Odyssey directors and officers' motions to dismiss the lawsuit because Connolly and Molinari did not file an amended petition and advised the trial court they will not file an amended petition.

We conclude the trial court did not err when it sustained the Odyssey directors and officers' special exceptions or when it granted Odyssey's, and the Odyssey di-

rectors and officers' motions to dismiss. The trial court's orders are affirmed.

## I. FACTUAL AND PROCEDURAL BACKGROUND

On July 9, 2004, Molinari filed this shareholder derivative lawsuit on behalf of Odyssey. That pleading was amended on March 6, 2006, and Connolly joined as a plaintiff. On July 28, 2006, Connolly and Molinari, shareholders of Odyssey stock, filed their consolidated third amended shareholder derivative petition alleging breach of fiduciary duty, abuse of control, gross mismanagement, waste of corporate assets, and unjust enrichment. In this pleading, under the heading "Defendants' Wrongful Course of Conduct," Connolly

and Molinari alleged the Odyssey directors breached their fiduciary duties[1] and claimed that instead of taking action to halt the wrongdoings, the Odyssey directors and officers sold more than $60 million of their Odyssey stock between May 2003 and December 2003. Also, in this same pleading, they alleged under the heading "Derivative and Demand Futility Allegations": (1) they were bringing the lawsuit to redress injuries suffered by Odyssey as a result of the officers' and directors' breaches of fiduciary duty, abuse of control, gross mismanagement, and unjust enrichment; (2) they will adequately and fairly represent the interests of Odyssey; (3) they were owners of Odyssey

1. Specifically, Connolly and Molinari alleged the Odyssey directors breached their fiduciary duties by: (1) accelerating Odyssey's expansion program and heightening its patient retention efforts through a scheme to engage in improper billing practices, and patient retention and admission practices so Odyssey's image would improve and they could "unload their personal holdings of Odyssey stock at favorable prices"; (2) causing Odyssey to report as revenue, unlawful billings (i.e., double billing, billing for services not rendered, and recognizing revenue that exceeded Medicare caps for reimbursement) to Medicare, Medicaid, and private insurers; and (3) allowing Odyssey to admit patients who did not meet the medical criteria for terminal illness, to retain patients who improved or stabilized while in hospice and no longer had a prognosis of six months or less to live, to back-date re-certifications for hospice patients, and to change diagnoses to justify retention as patients' conditions improved or stabilized. Connolly and Molinari alleged the Odyssey directors were aware of the ongoing, improper practices related to Medicare billing, and patient retention and admission practices because: (1) the Oklahoma State Attorney's Office was investigating Odyssey's Oklahoma hospice center for Medicare billing fraud; (2) the former general manager of the Oklahoma City hospice center reported that Gasmire imposed unreasonable census goals, knew the census results were inflated with inappropriate admissions and that nurses protested to the Odyssey directors and officers about the inappropriate admissions, but were told to admit the patients anyway; (3) on April 12, 2004, *Barron's* published an article entitled "Troubling Odyssey: Questions Arise About Hospice Company's Patient Care, Level of Medicare Payments," reporting that Odyssey exceeded its Medicare cap, which is considered a breach of accepted practices and raised a red flag about admittance procedures and the possibility that ineligible patients were being accepted into hospice programs; (4) in September 2004, the U.S. Department of Justice (DOJ) notified Odyssey it was under investigation for violations of the False Claims Act; (5) Odyssey delayed announcing the DOJ investigation until October 18, 2004, when it also announced Gasmire had decided to leave Odyssey; (6) in July 2005, the DOJ informed Odyssey its investigation was caused by Texas and Wisconsin *qui tam* actions filed against Odyssey in 2003; (7) Odyssey announced it was piloting an information system which would integrate its billing, clinical management, and electronic records with full implementation in 2008; and (8) on February 21, 2006, Odyssey announced it had reached an agreement with the DOJ, settling the matter for $13 million and entering into a corporate integrity agreement, and on July 11, 2006, publically announced it had finalized its settlement with the DOJ and OIG, and pursuant to the settlement, the *qui tam* actions were dismissed.

stock during the time of the alleged wrongful transactions; (4) Gasmire, Burnham, Rash, Carlyle, Cross, Feldstein, Schabel, and Steffy were directors of Odyssey during the relevant period of time; and (5) demand on the board of directors was futile.

On August 15, 2006, the Odyssey directors and officers filed their special exceptions and motion to dismiss. Also, Odyssey filed a motion to dismiss. Connolly and Molinari filed their response and on September 19, 2006, the trial court held a hearing at which time the motions were taken under advisement. On September 28, 2006, the trial court sustained the Odyssey directors and officers' special exceptions concluding "the consolidated third amended shareholder derivative petition failed to state the necessary factual allegations to show demand futility." Further, the trial court ordered Connolly and Molinari to amend their petition to include the necessary factual allegations to show demand futility by October 2, 2006. On October 2, 2006, Connolly and Molinari sent a letter to the trial court stating they would not be filing an amended petition. As a result, on October 3, 2006, the trial court ordered the case dismissed without prejudice.

## II. DEMAND FUTILITY

In issues one and two, Connolly and Molinari argue the trial court erred when it sustained the Odyssey directors and officers' special exceptions on the grounds Connolly and Molinari failed to state the necessary factual allegations to show demand futility, and dismissed the lawsuit for failure to replead.

**2.** TEX. BUS. ORGS.CODE ANN. § 1.008(c) (Vernon Supp.2007) (provisions of chapters 20 and 21

### A. Standard of Review

■■■ Review of a trial court's dismissal of a case based on the grant of special exceptions requires examination of two distinct rulings: (1) the decision to sustain the special exceptions; and (2) the decision to dismiss the cause of action. *Cole v. Hall,* 864 S.W.2d 563, 566 (Tex.App.-Dallas 1993, writ dism'd w.o.j.). First, an appellate court reviews the propriety of the trial court's decision to grant the special exceptions. *Cole,* 864 S.W.2d at 566. Then, if the trial court's decision to sustain the special exceptions was proper, an appellate court reviews whether the decision to dismiss the case was appropriate. *Cole,* 864 S.W.2d at 566.

■■■ A trial court has broad discretion in ruling on special exceptions. *Adams v. First Nat'l Bank of Bells/Savoy,* 154 S.W.3d 859, 876 (Tex.App.-Dallas 2005, no pet.). A trial court's ruling on special exceptions is reversed only if there has been an abuse of discretion. *Adams,* 154 S.W.3d at 876; *cf. Brehm v. Eisner,* 746 A.2d 244, 253 (Del.2000) (review of demand futility pursuant to Delaware Chancery Court Rule 23.1 is de novo). A trial court abuses its discretion if its action is arbitrary, unreasonable, and without reference to any guiding rules or principles. *Downer v. Aquamarine Operators, Inc.,* 701 S.W.2d 238, 241–42 (Tex.1985); *Adams,* 154 S.W.3d at 876. If the trial court properly sustained the special exceptions and the plaintiff refuses or fails to amend, the trial court does not err in dismissing the cause of action. *Cole,* 864 S.W.2d at 566.

### B. Applicable Law

#### 1. Shareholder Derivative Actions

■ The Texas For–Profit Corporation Law[2] applies to foreign for-profit corpora-

and title 1 to the extent applicable to for-

tions transacting business in Texas. Tex. Bus. Orgs.Code Ann. § 21.001(2) (Vernon Supp.2007). A foreign corporation is a for-profit corporation formed under the laws of a jurisdiction other than Texas. *Id.* § 21.002(7) (previously Tex. Bus. Corp. Act Ann. art. 1.02, § A(14) (Vernon 2003)). Unless otherwise provided by law, a shareholder may not institute a derivative proceeding until the 91st day after the date a written demand is filed with the corporation stating with particularity the act, omission, or other matter that is the subject of the claim or challenge, and requesting the corporation to take suitable action. *Id.* § 21.553(a) (previously Tex. Bus. Corp. Act Ann. art. 5.14, § C). In a derivative proceeding brought in the right of a foreign corporation, the requirement that the shareholder make written demand is governed by the laws of the jurisdiction where the foreign corporation is incorporated. *See id.* § 21.562(a) (previously Tex. Bus. Corp. Act Ann. art. 5.14, § K). However, while the substantive law of the jurisdiction where the foreign corporation is incorporated applies, Texas procedural law governs matters of remedy and procedure. *See Moonlight Invs. Ltd. v. John,* 192 S.W.3d 890 (Tex.App.-Eastland 2006, pet. struck) (Texas procedural law applied, even though case involved foreign corporation and Maryland substantive law applied).

## 2. Texas Procedural Law

Under Texas procedural law, a party is generally required to file a special exception to challenge a defective pleading. Tex.R. Civ. P. 90, 91; *Moonlight,* 192 S.W.3d at 893. Texas Rules of Civil Procedure 90 and 91 provide the means for a

profit corporations may be cited as "Texas For-Profit Corporation Law").

party to specially except to an adverse party's pleadings. *See* Tex.R. Civ. P. 90, 91; *Adams,* 154 S.W.3d at 876. Texas Rule of Civil Procedure 91 provides that a special exception shall point out the pleading excepted to and, with particularity, the defect or insufficiency in the allegations of the pleading. *See* Tex.R. Civ. P. 91; *Moonlight,* 192 S.W.3d at 893. The purpose of special exceptions is to furnish a party with a medium by which to force clarification of an adverse party's pleadings when they are not clear or sufficiently specific. *Adams,* 154 S.W.3d at 876; *see Friesenhahn v. Ryan,* 960 S.W.2d 656, 658 (Tex.1998).

When a trial court sustains a party's special exceptions, the trial court must give the pleader an opportunity to amend his pleadings before dismissing the case. *See Friesenhahn,* 960 S.W.2d at 658; *Moonlight,* 192 S.W.3d at 893. When a petition fails to satisfy the requirements for demand futility under the laws of a foreign jurisdiction, the proper remedy under Texas procedural law is to sustain the special exceptions and allow the plaintiff an opportunity to amend the petition, even if dismissal is the proper remedy under the laws of the foreign jurisdiction. *See Moonlight,* 192 S.W.3d at 893 (dismissal proper remedy under Maryland law, but under Texas law, plaintiff should have been allowed opportunity to amend).

## 3. Delaware Substantive Law

A basic principle of the General Corporation Law of the State of Delaware [3] is that directors, rather than shareholders, manage the business and affairs of the corporation. *See* Del.Code Ann. tit. 8, § 141(a) (West Supp.2008); *Stone v.*

3. Del.Code Ann. tit. 8, § 398 (West 2006) (chapter 1 "shall be known and may be identified and referred to as the 'General Corporation Law of the State of Delaware.' ").

*Ritter*, 911 A.2d 362, 366 (Del.2006); *Braddock v. Zimmerman*, 906 A.2d 776, 784 (Del.2006); *Rales v. Blasband*, 634 A.2d 927, 932 (Del.1993); *Aronson v. Lewis*, 473 A.2d 805, 811–12 (Del.1984), *overruled on other grounds Brehm*, 746 A.2d at 253 (proper standard of review is de novo). The decision to bring a lawsuit or to refrain from litigating a claim on behalf of a corporation is a decision concerning the management of the corporation. *Spiegel v. Buntrock*, 571 A.2d 767, 773 (Del.1990). Consequently, such decisions are a part of the board of directors' responsibility. *See* DEL.CODE ANN. tit. 8, § 141(a); *Spiegel*, 571 A.2d at 773. However, a shareholder may file a derivative action to redress an alleged harm to the corporation. *See Spiegel*, 571 A.2d at 773. In essence, a derivative action is a challenge to the board of directors' managerial power. *See Spiegel*, 571 A.2d at 773.

Delaware law imposes certain prerequisites on a shareholder's right to sue derivatively. *See Stone*, 911 A.2d at 366; *Spiegel*, 571 A.2d at 773; *Aronson*, 473 A.2d at 811. Under Delaware Chancery Court Rule 23.1, a shareholder's right to bring a derivative action does not arise until: (1) he has made a demand on the board of directors to institute such an action and such demand has been wrongfully refused; or (2) the shareholder has demonstrated, with particularity, that demand is excused because it would be futile.[4] *See* DEL. CH. CT. R. 23.1[5]; *Stone*, 911 A.2d at 366–67; *Braddock*, 906 A.2d at 784; *Spiegel*, 571 A.2d at 773; *Aronson*, 473 A.2d at 811–12.

The burden for demonstrating demand futility lies with the shareholder.

---

4. The pre-suit demand requirement of Delaware Chancery Court Rule 23.1 is a substantive right designed to assure a shareholder gives the corporation the opportunity to rectify an alleged wrong without litigation, to decide whether to invest the resources of the corporation in litigation, and to control any litigation which does arise. *See Braddock*, 906 A.2d at 784; *Spiegel*, 571 A.2d at 773; *Aronson*, 473 A.2d at 809. The rationale of Delaware Chancery Court Rule 23.1 has two significant parts. *See Brehm*, 746 A.2d at 255. On the one hand, it allows a shareholder to proceed with discovery and trial if the shareholder complies with this rule and can articulate a reasonable basis to be entrusted with a claim that belongs to the corporation. *See Brehm*, 746 A.2d at 255. On the other hand, the rule does not permit a shareholder to cause the corporation to expend money and resources in discovery and trial in the shareholder's quixotic pursuit of a purported corporate claim based solely on conclusions, opinions, or speculation. *See Brehm*, 746 A.2d at 255.

5. Specifically, Delaware Chancery Court Rule 23.1 states:

> Rule 23.1. *Derivative actions by shareholders.* In a derivative action brought by 1 or more shareholders or members to enforce a right of a corporation or of an unincorporated association, the corporation or association having failed to enforce a right which may properly be asserted by it, the complaint shall allege that the plaintiff was a shareholder or member at the time of the transaction of which the plaintiff complains or that the plaintiff's share or membership thereafter devolved on the plaintiff by operation of law. The complaint shall also allege with particularity the efforts, if any, made by the plaintiff to obtain the action the plaintiff desires from the directors or comparable authority and the reasons for the plaintiff's failure to obtain the action or for not making the effort. The action shall not be dismissed or compromised without the approval of the Court, and notice by mail, publication or otherwise of the proposed dismissal or compromise shall be given to shareholders or members in such manner as the Court directs; except that if the dismissal is to be without prejudice or with prejudice to the plaintiff only, then such dismissal shall be ordered without notice thereof if there is a showing that no compensation in any form has passed directly or indirectly from any of the defendants to the plaintiff or plaintiff's attorney and that no promise to give any such compensation has been made.
> DEL. CH. CT. R. 23.1.

*See Beam,* 845 A.2d at 1048–49; *Aronson,* 473 A.2d at 812. Delaware Chancery Court Rule 23.1 contains a heightened pleading standard, requiring a shareholder's allegations of demand futility to "comply with stringent requirements of factual particularity." *See Stone,* 911 A.2d at 367 n. 9; *Brehm,* 746 A.2d at 254; *Aronson,* 473 A.2d at 811. It is not satisfied by conclusory statements or mere notice pleading. *See Brehm,* 746 A.2d at 254. The pleading standard for demand futility requires a fact-intensive, director-by-director analysis. *See Postorivo v. AG Paintball Holdings, Inc.,* No. 2991–VCP, 3111–VCP, 2008 WL 553205, *6–7 (Del.Ch. Feb.29, 2008) (mem.op.).[6] The shareholder must set forth particularized factual statements that are essential to the claim, which are sometimes also referred to as "ultimate facts," "principal facts," or "elemental facts." *See Brehm,* 746 A.2d at 254. These particularized factual statements should also be simple, concise, and direct. *See Brehm,* 746 A.2d at 254. However, the shareholder is not required to plead evidence. *See Brehm,* 746 A.2d at 254.

■■■■■ In order for a shareholder to demonstrate demand futility, a shareholder must show the directors are under an influence that sterilizes their discretion or they are incapable of making an impartial decision. *See Rales,* 634 A.2d at 932; *Aronson,* 473 A.2d at 811; *Kohls v. Duthie,* 791 A.2d 772, 779 (Del.Ch.2000). However, there is a presumption that, in making a business decision, the directors of a corporation acted on an informed basis, in good faith, and in the honest belief that the action was taken in the best interests of the corporation, i.e., directors are entitled to the presumption that they were faithful to their fiduciary duties. *See Beam,* 845 A.2d at 1048; *Aronson,* 473 A.2d at 812. According to Delaware law, demand futility must be determined pursuant to either the standards articulated in *Aronson* or those set forth in *Rales. See Braddock,* 906 A.2d at 784.

■■■■■ When a shareholder's causes of action in a derivative suit arise from an *affirmative business decision* made by a corporation's board of directors, courts apply the two-part *Aronson* test. *See Braddock,* 906 A.2d at 784; *Aronson,* 473 A.2d at 814. Under the *Aronson* test, demand will be excused if the shareholder pleads particularized facts creating a reasonable doubt that: (1) the directors are disinterested and independent; or (2) the challenged transaction was otherwise the product of a valid exercise of business judgment. *See Braddock,* 906 A.2d at 784. These two parts of the *Aronson* test are in the disjunctive, so if either part is satisfied, demand is excused. *See Brehm,* 746 A.2d at 256.

■■■■■ However, the Delaware Supreme Court has recognized the existence of situations in which the *Aronson* test cannot apply. *See Rales,* 634 A.2d 927; *Kohls,* 791 A.2d at 780. Where a corporation's board of directors is sued derivatively because they have *failed to do something,* demand is not excused, unless there are allegations demonstrating why the board is

---

**6.** Under Delaware Supreme Court Rule 17(a), unpublished orders of the Delaware Supreme Court as well as unpublished orders and opinions of the lower courts may be cited as precedent. Sup.Ct. R. Adv. Comm., Del.App. Handbook, 8–vi (Sept.1996, 2d ed.), http://courts.state.de.us/Rules/?handbook.pdf; *see also* DEL. SUP.CT. R. 14(g) (discussing form of citation for unreported opinions), 17(a) (stating all decisions shall be by written opinion or order), 93 (discussing criteria for publishing opinions and form of citation for unreported opinions); DEL. CH. CT. R. 171(h) (discussing procedure when citing unreported or memorandum opinions); *cf.* TEX.R.APP. P. 47.4, 47.7.

incapable of considering a demand. *See Rales,* 634 A.2d at 934 n. 9; *Kohls,* 791 A.2d at 780; *see also Stone,* 911 A.2d at 367 (in *Stone,* plaintiffs conceded *Rales* test applied in absence of business decision).

There are three scenarios in which the *Rales* test, rather than the *Aronson* test, applies: (1) a business decision was made by the board of directors, but a majority of the directors making the decision has been replaced; (2) the subject of the derivative suit is not a business decision of the board of directors; and (3) the decision being challenged was made by the board of directors of a different corporation. *See Braddock,* 906 A.2d at 784; *Rales,* 634 A.2d at 933–34. Under the *Rales* test, demand is excused only where a shareholder pleads particularized facts that create a reasonable doubt the board of directors could have properly exercised its independent and disinterested business judgment in responding to a demand, at the time the petition was filed. *See Braddock,* 906 A.2d at 784; *Rales,* 634 A.2d at 934. Generally, the difference between the *Aronson* test and the *Rales* test is that courts do not apply the second part of the *Aronson* test under the *Rales* test. *See Guttman v. Huang,* 823 A.2d 492, 499–501 (Del.Ch.2003) (second part of *Aronson* test excuses demand if shareholder pleads particularized facts creating a reasonable doubt that challenged transaction was otherwise product of valid business judgment).

### a. First Part of *Aronson* Test and *Rales* Test—Disinterested and Independent

Under both the first part of the *Aronson* test and the *Rales* test, a shareholder must plead, with particularity, facts that raise a reasonable doubt that a majority of the directors (or in the case of an even number of directors, exactly half) are disinterested and independent, demonstrating that they are unable to act objectively with respect to a pre-suit demand. *See Beam v. Stewart,* 845 A.2d 1040, 1049 (Del.2004); *Orman v. Cullman,* 794 A.2d 5, 22 (Del.Ch.2002); *see also In re InfoUSA,* No.1956–CC, 2007 WL 2419611, *16 (Del.Ch. Aug.20, 2007) (mem.op.) (if even number of directors show exactly half). It is not enough for a shareholder to merely assert that demand is futile because: (1) the directors would have to sue themselves; or (2) the directors approved of the underlying transaction. *See Brehm,* 746 A.2d at 257 n. 34; *Aronson,* 473 A.2d at 817–18; *Kohls,* 791 A.2d at 779.

### (1) Oversight Liability Under *Rales* Test

Under the *Rales* test, a shareholder may also attempt to raise a reasonable doubt that a majority of the directors (or in the case of an even number of directors, exactly half) are disinterested and independent by asserting the directors face a substantial likelihood of liability that renders them personally interested in the outcome of the decision on whether to pursue the claims asserted in the petition. *See Stone,* 911 A.2d at 367; *Forsythe v, ESC Fund Mgmt. Co.,* No. 1091–VCL, 2007 WL 2982247, *6 (Del.Ch. Oct.9, 2007) (mem.op.); *see also InfoUSA,* 2007 WL 2419611 at *16 (if even number of directors show exactly half). For pre-suit demand purposes, directors have a disabling interest when the potential for liability is not a mere threat, but instead, may rise to a substantial likelihood. *Ryan v. Gifford,* 918 A.2d 341, 355 (Del.Ch.2007). A shareholder may assert the directors face a substantial likelihood of liability because they failed to act in the face of a known duty to act, demonstrating a conscious disregard for their responsibilities and

breaching their duty of loyalty by failing to discharge that fiduciary obligation in good faith. *See Stone,* 911 A.2d at 369. This is also known as "oversight liability."

 The necessary conditions predicate for director "oversight liability" are the directors: (1) utterly failed to implement any reporting or information system or controls; or (2) having implemented such a system or controls, consciously failed to monitor or oversee its operations, disabling themselves from being informed of the risks or problems requiring their attention. *Stone,* 911 A.2d at 370; *Forsythe,* 2007 WL 2982247 at \*6. In either situation, imposition of liability requires a showing that the directors knew they were not discharging their fiduciary obligations. *Stone,* 911 A.2d at 370; *Forsythe,* 2007 WL 2982247 at \*6.

b. **Second Part of** *Aronson* **Test—Challenged Transaction Not Product of Valid Exercise of Business Judgment**

 If a court reviews a shareholder's claim of demand futility under the *Aronson* test and determines the petition does not allege, with particularity, facts from which the court could reasonably conclude that a majority of the directors in office, when the petition was filed, were disabled from impartially considering a demand, then the second part of the *Aronson* test should be analyzed. *See Khanna v. McMinn,* No. Civ. A. 20545–NC, 2006 WL 1388744, \*12, \*22 (Del.Ch. May 9, 2006) (mem.op.). A shareholder seeking to demonstrate demand futility under the second part of the *Aronson* test must plead particularized facts sufficient to raise a reasonable doubt that: (1) the action was taken honestly and in good faith; or (2) the board was adequately informed in making the decision. *See Khanna,* 2006 WL 1388744 at \*23. The court's inquiry in this context is predicated on concepts of gross negligence. *See Brehm,* 746 A.2d at 259; *Aronson,* 473 A.2d at 812; *Khanna,* 2006 WL 1388744 at \*23. The court may not assume the transaction is a wrong against the corporation requiring corrective steps by the board. *Aronson,* 473 A.2d at 814. Rather, the alleged wrong is substantively reviewed against the factual background alleged in the complaint. *Id.*

**C. Special Exceptions**

In issue one, Connolly and Molinari argue the trial court erred when it sustained the Odyssey directors and officers' special exceptions. They argue the trial court: (1) failed to consider the totality of their factual allegations when considering demand futility; (2) refused to draw inferences in their favor; (3) required them to demonstrate the probability of success on the merits, rather than a reasonable doubt that the directors were disinterested and independent; and (4) treated their common law breach of fiduciary duty claims as Medicare fraud claims.

The Odyssey directors and officers respond that Connolly and Molinari failed to plead demand futility with particularized factual allegations as evidenced by their vague allegations asserting: (1) Odyssey violated the law; (2) Odyssey engaged in a pattern of wrongdoing; (3) Odyssey exceeded the Medicare "cap"; (4) the individual directors participated in the alleged wrongdoing or were aware of any wrongdoing; (5) at least four of the directors were aware of the alleged "red flags"; (6) the directors possessed adverse, material non-public information and sold stock based on that information; (7) Gasmire's employee status destroys his independence; (8) the directors' relationships create reasonable doubt regarding their independence; or (9) the board made a conscious decision not to act in

response to known and understood improper practices, creating a reasonable doubt that their actions were a valid exercise of business judgment.

### 1. Disinterested and Independent Under Both the *Aronson* and *Rales* Tests

 Connolly and Molinari argue their consolidated third amended shareholder derivative petition meets their pleading burden because it raises a reasonable doubt that a majority of the Odyssey directors are disinterested and lack independence or demonstrates a majority of the directors faced a substantial likelihood of liability because: (a) they served on the compliance committee; (b) they served on the audit committee; (c) the non-employee directors received compensation and benefits, and Gasmire was an employee of Odyssey; (d) they sold their Odyssey stock; (e) they have "prejudicial relationships"; (f) the entire Odyssey board participated in the wrongs alleged; and (g) the individual directors' expertise and experience caused them to have a heightened duty to ensure compliance with the rules and regulations.

#### a. Compliance Committee

Connolly and Molinari alleged that five of the Odyssey directors—Burnham, Cross, Rash, Steffy, and Feldstein—are not disinterested because they were on the compliance committee. Connolly and Molinari alleged the compliance committee: (1) knew Odyssey was highly dependent on Medicare's hospice benefit; (2) caused Odyssey to report it was in compliance with all applicable Medicare and Medicaid laws, rules, and regulations; and (3) was aware of the improper Medicare and Medicaid billing practices, patient retention, and patient admission. Also, Connolly and Molinari asserted the directors on the compliance committee breached their fiduciary duties to Odyssey when they caused the compliance committee to report Odyssey was in compliance with all applicable Medicare and Medicaid laws and regulations. As a result of this breach, they claimed those directors were interested in the wrongdoing and any demand on them would have been futile.

 Connolly and Molinari have pleaded no particularized facts showing the compliance committee failed to perform their duties. Connolly and Molinari alleged only that the compliance committee "would have known or at least been apprised of" the alleged wrongdoing.[7] Membership on the compliance committee alone does not render directors too interested to consider a shareholder's demand. *See Desimone v. Barrows*, 924 A.2d 908, 943 (Del. Ch.2007) (membership on audit committee alone does not render directors interested); *Guttman*, 823 A.2d at 507 (same). In addition, knowledge on the part of any one director cannot be imputed to other directors as result of their shared service on the compliance committee. *See Desimone*, 924 A.2d at 943.

We conclude the trial court did not abuse its discretion when it concluded Connolly and Molinari's consolidated third

---

7. Cases have found the following facts important when a plaintiff is trying to raise a reasonable doubt as to a committee's disinterest: (1) the compliance committee met sporadically and devoted patently inadequate time to its work; (2) the compliance committee had clear notice of the alleged wrongdoing and simply chose to ignore it or, even worse, encourage its continuation; (3) how the compliance committee knew of the alleged wrongdoing; (4) who presented it with information of Odyssey's alleged wrongdoing; or (5) when it learned of Odyssey's alleged wrongdoing. *See Guttman*, 823 A.2d at 507 (discussing audit committee).

amended shareholder derivative petition did not raise a reasonable doubt that the directors on the compliance committee are disinterested by virtue of their membership on the compliance committee.

### b. Audit Committee

Connolly and Molinari alleged three of the Odyssey directors—Carlyle, Rash, and Steffy—are not disinterested because they were on the audit committee. Connolly and Molinari alleged demand was futile on the directors of the audit committee because they failed to ensure proper legal, financial, regulatory, and ethical compliance, and ignored improper practices related to Medicare billings.

 Connolly and Molinari have pleaded no particularized facts showing the audit committee failed to perform their duties.[8] Membership on an audit committee does not alone render directors personally liable or too interested to consider a shareholder's demand. *See Guttman,* 823 A.2d at 507. In addition, knowledge on the part of any one director cannot be imputed to other directors as result of their shared service on the audit committee. *See Desimone,* 924 A.2d at 943.

Further, Odyssey's audit committee consisted of only three out of eight directors. Even assuming Connolly and Molinari pleaded particularized facts creating a reasonable doubt that the three directors on the audit committee were disinterested and independent, pre-suit demand will not be excused, unless they pleaded particularized facts demonstrating at least one other director was interested and lacked independence. *See id.* at 942. Although they have alleged the remaining directors are interested and lack independence for other reasons, those allegations are rejected as

being insufficient under the applicable standard elsewhere in this opinion.

We conclude the trial court did not abuse its discretion when it concluded Connolly and Molinari's consolidated third amended shareholder derivative petition did not raise a reasonable doubt that the directors on the audit committee are disinterested by virtue of their membership on the audit committee.

### c. Compensation Committee, Non-employee Directors, and Employee Director

Connolly and Molinari alleged that four of the Odyssey directors—Cross, Rash, Wan, and Schabel—served on the compensation committee and demand on the remaining directors—Gasmire, Burnham, Carlyle, Feldstein, and Steffy—would have been futile because the compensation committee determined their awards, compensation, and benefits. They alleged the non-employee directors were not disinterested and independent because they received lucrative compensation and stock options. Also, they alleged Gasmire's principal occupation was his employment with Odyssey, rendering him dependent on the directors serving on the compensation committee.

 Connolly and Molinari's allegations that the non-employee directors were not disinterested and independent because they received compensation and benefits are conclusory. The mere fact that a director receives compensation for his services as a board member does not demonstrate demand futility. *See Khanna,* 2006 WL 1388744 at *16. Connolly and Molinari have failed to allege with factual particularity that the compensation received by the non-employee board members was

---

8. *See supra* note 7.

material to each director or outside of the norm. *See id.*

Also, Connolly and Molinari alleged Gasmire, an employee director, was not independent because he was beholden to the directors on the compensation committee, which set his salary. They did not allege any facts suggesting the members of the compensation committee were in any way interested by virtue of their membership on that committee, although they have alleged Cross, Rash, Wan, and Schabel are interested for other reasons, which are rejected elsewhere in this opinion. Also, as previously determined sufficient in other cases, no particularized facts have been pleaded demonstrating Gasmire was beholden to the directors on the compensation committee, received a salary or benefits that were outside of the norm, he needed to remain employed at Odyssey because his shares were not vested, or the presence of some other factor. *See InfoUSA,* 2007 WL 2419611 at *13; *Khanna,* 2006 WL 1388744 at *16, *18.

We conclude the trial court did not abuse its discretion when it concluded Connolly and Molinari's consolidated third amended shareholder derivative petition did not raise a reasonable doubt that the non-employee directors or the employee director are disinterested or independent as a result of receiving compensation or benefits for their services.

#### d. Sales of Odyssey Stock

Connolly and Molinari alleged seven of the directors—Gasmire, Burnham, Rash, Carlyle, Cross, Feldstein, and Steffy—participated in illegal insider trading while in the possession of adverse material, non-public information. Connolly and Molinari asserted demand was futile on these directors because: (1) they received a personal financial benefit from the challenged insider trading transactions; and (2) they

face a substantial likelihood of liability for their improper sales.

While Connolly and Molinari alleged the proceeds of the directors' sales of Odyssey stock was substantial, their consolidated third amended shareholder derivative petition did not contain any particularized facts providing an inference of insider trading. When determining a pleading was insufficient, the Delaware courts have noted the failure to plead particularized facts demonstrating a common trading pattern among the directors or an inconsistency in the directors' trading when compared with prior years. *See Guttman,* 823 A.2d at 503–04. Also, Connolly and Molinari failed to address whether the directors traded because options were expiring or restrictions on liquidity, if any, had recently ended. *See id.* They did not state what portion of each director's Odyssey holdings the alleged insider-sales comprised. *See id.* Further, they did not describe the adverse, non-public information the directors possessed, how and when they obtained the adverse, non-public information, or in what manner the directors' individual sales of stock was linked to that adverse, non-public information. The mere fact that directors sold stock for a substantial return does not support the conclusion that the directors were interested or that they face a substantial likelihood of liability for those sales. *See id.* In addition, while Connolly and Molinari point to several stock sales, it appears these sales were between the directors and the marketplace because they have not alleged a self-dealing transaction, where the directors can be viewed as sitting on both sides of the transaction. *See id.* at 502.

We conclude the trial court did not abuse its discretion when it concluded Connolly and Molinari's consolidated third amended shareholder derivative petition did not raise a reasonable doubt that a

majority of the Odyssey directors are disinterested and lack independence, or face a substantial risk of liability because they reaped a financial benefit from their sales of Odyssey stock.

### e. Entangling Relationships

Connolly and Molinari alleged six of the directors—Burnham, Rash, Cross, Feldstein, Steffy, and Gasmire—have developed conflicts of interest and "prejudicial entanglements" preventing them from taking the necessary and proper action on behalf of Odyssey because each of those directors had longstanding relationships with some of the other directors.[9]

According to these allegations, some of the Odyssey directors are not strangers and indeed, may be fairly close, but allegations of this nature do not allow a reasonable inference that the exercise of a director's discretion and judgment is impaired. *See Khanna*, 2006 WL 1388744 at *19. Connolly and Molinari have not alleged with factual particularity that any of these directors lack independence be-

cause of financial ties, familial affinity, a particularly close or intimate personal or business affinity, or in the past these relationships caused a director to act nonindependently *vis a vis* an interested director. *See Beam*, 845 A.2d at 1051. For pre-suit demand purposes, friendship must be accompanied by substantially more in the nature of serious allegations that would lead to a doubt as to a director's independence. *See id.; Khanna*, 2006 WL 1388744 at *19. Without more, Connolly and Molinari's pleadings are insufficient to rebut the presumption of independence. *See Beam*, 845 A.2d at 1051. Allegations of mere personal friendship or an outside business relationship, standing alone, are insufficient to raise a reasonable doubt about a director's independence. *See id.* at 1050. Further, Connolly and Molinari have not alleged any of the directors are beholden to a dominant, interested director such that his discretion would be sterilized. *See Rales*, 634 A.2d at 936; *Aronson*, 473 A.2d at 816; *InfoUSA*, 2007 WL 2419611 at *13.

**9.** The following is a summary of Connolly and Molinari's allegations as to each of these directors:

(1) Burnham: (a) Burnham co-founded Odyssey with Gasmire, Cross, and Steffy; and
(b) Burnham and Gasmire were employed by Vitas Healthcare Corporation.

(2) Rash: (a) Rash, Feldstein, and Steffy are all members of the board of Providence Healthcare Company;
(b) Rash was the chief operating officer and Steffy was a co-founder of Community Health Systems, Inc.; and
(c) Rash is the chairman and Feldstein is a director of Pre-Veinor Resources, Inc.

(3) Cross: (a) Cross, Burnham, Gasmire, and Steffy co-founded Odyssey; and
(b) Cross and Steffy co-founded Intensiva Healthcare Corporation.

(4) Feldstein: (a) Feldstein, Rash, and Steffy are members of the board of Providence Healthcare Company; and
(b) Feldstein is a director and Rash is the chairman of Pre-Veinor Resources, Inc.

(5) Steffy: (a) Steffy, Burnham, Gasmire, and Cross co-founded Odyssey;
(b) Steffy, Rash, and Feldstein are members of the board of Providence Healthcare Company;
(c) Steffy and Cross co-founded Intensiva Healthcare Corporation; and
(d) Steffy was a co-founder and Rash was the chief operating officer of Community Health Systems, Inc.

(6) Gasmire: (a) Gasmire, Burnham, Cross, and Steffy co-founded Odyssey; and
(b) Gasmire and Burnham were employed by Vitas Healthcare Corporation.

We conclude the trial court did not abuse its discretion when it concluded Connolly and Molinari's consolidated third amended shareholder derivative petition did not raise a reasonable doubt that a majority of the Odyssey directors lack independence because of their personal or professional relationships.

### f. Entire Board Engaged in Wrongdoing

Connolly and Molinari alleged the entire Odyssey board: (1) failed to ensure appropriate compliance with the rules and regulations related to Medicare and Medicaid billing, and patient admission and retention; (2) participated in and approved the wrongs alleged to have occurred; (3) would be forced to sue themselves; (4) could not fairly and fully prosecute a suit against themselves; (5) would be exposed to potential civil or criminal actions; and (5) would not be covered by the directors' and officers' liability insurance if they sued themselves.

Connolly and Molinari's allegations involving the Odyssey directors collectively are vague. Their allegations that the directors participated in and approved of Odyssey's alleged wrongdoing are conclusory. It is not enough to merely assert that demand is futile because the directors would have to sue themselves or approved of the underlying transactions. *See Brehm*, 746 A.2d at 257 n. 34; *Aronson*, 473 A.2d at 817–18; *Kohls*, 791 A.2d at 779. Although Connolly and Molinari identified the various positions held by each director, they have not pleaded particularized facts detailing the precise duties of each role these directors played at Odyssey, the information that would have come to their attention in those roles, how they benefitted from the alleged wrongdoing, or any indication why they would have perceived irregularities or wrongdoing. *See Guttman*, 823 A.2d at 503.

Connolly and Molinari alleged the Odyssey directors would have been aware of or perceived the irregularities or wrongdoing, i.e., there were "red flags." *See Forsythe*, 2007 WL 2982247 at *6. However, according to Connolly and Molinari's pleading, some of those alleged "red flags" occurred after Molinari filed her original shareholder derivative petition on July 9, 2004, i.e., in September 2004, the DOJ notified Odyssey it was under investigation; Odyssey delayed announcing the DOJ investigation and Gasmire's decision to leave until October 18, 2004; in July 2005, the DOJ informed Odyssey its investigation was caused by the two *qui tam* actions; on February 21, 2006, Odyssey announced it had reached a settlement with the DOJ and on July 11, 2006, Odyssey announced that settlement was finalized.

Also, Connolly and Molinari alleged the directors' and officers' liability insurance policies covering the directors contain provisions that eliminate coverage for any action brought directly by Odyssey against the directors or officers, known as the "insured versus insured exclusion." They alleged that, as a result, if the directors were to sue themselves or the Odyssey officers, there would be no directors' and officers' insurance protection. However, the courts have routinely rejected the argument that an "insured versus insured exclusion" demonstrates a director's inability to fairly consider a demand. *See, e.g., Caruana v. Saligman*, No. 11135, 1990 WL 212304 at *4 (Del.Ch. Dec.21, 1990).

We conclude the trial court did not abuse its discretion when it concluded Connolly and Molinari's consolidated third amended shareholder derivative petition

did not raise a reasonable doubt that a majority of the Odyssey directors were interested and lacked independence or faced a substantial likelihood of liability because the entire board engaged in wrongdoing.

## g. Individual Directors' Experience and Expertise

Connolly and Molinari alleged the nine individual Odyssey directors' experience and expertise caused them to have a heightened duty to ensure compliance with the rules and regulations relating to the healthcare industry, but because they breached their duties, demand was futile.[10]

**10.** They alleged each individual director was a seasoned member of the Odyssey board and had unique insight and expertise regarding the operations and legal operations of Odyssey based on his individual experience as follows:

(1) Burnham: "Burnham is also one of Odyssey's founders. Prior to founding Odyssey, Burnham served in executive positions with other healthcare companies, including Vitas Healthcare, Inc., Olsten Kimberly Quality Care, Inc., Baxter Healthcare Corporation[,] and Caremark, Inc. He is also active in National Hospice and Palliative Care Organization, including serving on the association's legislative committee";

(2) Rash: "Rash possesses more than 20 years of experience in healthcare operations. Rash co-founded Province Healthcare in February 1996, and currently serves as its Chairman and CEO. Rash previously served as Executive Vice President and COO with Community Health Systems. He is also Chairman of the Federation of American Hospitals and serves on the board of the Nashville Healthcare council";

(3) Carlyle: "Carlyle has built and run several healthcare companies throughout the last 20 years. His healthcare career began in the mid–80's as the CFO of Medical Care International. Carlyle was also one of the founders of Concentra, Inc., a comprehensive outsource solution for containing healthcare and disability costs, serving the occupational, auto, and group healthcare markets. He founded Magella Healthcare Corporation, serving as President and CEO from 1998 until 2001 and served as CEO of Accuro Healthcare Solutions, Inc.";

(4) Cross: "Cross has served on Odyssey's Board since February 1996 and is also a co-founder of and original investor in Odyssey. Cross has served as Senior Vice President and Chief Development Officer for Select since January 1999. He was co-founder of Intensiva Healthcare Corporation, a provider of highly specialized, acute long-term care services, and served as its President and Chief Executive Officer from May 1994 until its merger with Select in December 1998. Further, Cross was founder, President[,] and CEO and a director of Advanced Rehabilitation Resources, Inc., a provider of outsourcing and management of comprehensive medical rehabilitation, subacute[,] and outpatient therapy programs and contract therapy services from 1990 to 1993";

(5) Feldstein: "Feldstein has been Professor and Robert Gumbiner Chair in Health Care Management at The Paul Merage School of Business, University of California at Irvine since 1987. He has written six books over sixty articles on healthcare. During several leaves from the University, Feldstein worked at the World Health Organization. He has been a consultant to many government and private health agencies, an expert witness on health anti-trust issues, as well as serving on the Board of Sutter Health and Province Healthcare";

(6) Schabel: "Schabel is President and COO of Lincare Holdings, Inc., a national provider of oxygen and other respiratory therapy services. Schabel has served in numerous management positions with Lincare since joining the company in 1989. He was named Senior Vice President in 1998 and in 2001 was also named COO. In April 2003, defendant Schabel was promoted to President of Lincare";

(7) Steffy: "Steffy has been called a 'serial entrepreneur' in the healthcare services sector. He is a co-founder of and an original investor in Odyssey. He began his career as a Hospital Administrator in Ohio and went on to establish and seed several prominent healthcare companies, including Intensiva Health Care Corporation, Community Health Systems[,] and SemperCare"; and

While Connolly and Molinari address each director individually, they make the same boilerplate statements: (1) each director had unique insight and expertise regarding the operations of the healthcare industry and federally run healthcare programs, and the legal operations of Odyssey based on his individual experience; and (2) each director's credentials and experience are listed. Although Connolly and Molinari identified the various positions held by each director, they have not pleaded particularized allegations detailing the precise duties of each role these directors played at Odyssey, the information that would have come to their attention in those roles, or any indication why they would have perceived irregularities or wrongdoing. Also, they fail to specify why these directors' experience and expertise caused them to have a heightened duty to ensure compliance with the rules and regulations and how this heightened duty caused them to be interested or lack independence.

We conclude the trial court did not abuse its discretion when it concluded Connolly and Molinari's consolidated third amended shareholder derivative petition did not raise a reasonable doubt that a majority of the individual Odyssey directors were disinterested and independent because of their experience and expertise.

## 2. Are Challenged Transactions the Product of Valid Exercise of Business Judgement?

▇▇▇ While we have addressed the first part of the *Aronson* test and the *Rales* test, Connolly and Molinari argue we must apply the second part of the *Aronson* test, which addresses whether the directors' actions were otherwise the product of a valid exercise of business judgment. However, even if the second part of the *Aronson* test applies, we conclude Connolly and Molinari have failed to plead, with particularity, facts that raise a reasonable doubt the challenged transactions were otherwise the product of a valid exercise of business judgment.

Connolly and Molinari argue Odyssey derived "substantially all" of its net patient revenue from the Medicare and Medicaid programs, so each director "would have known or at least been apprised of" Odyssey's operations and finances related to Medicare and the improper billing and patient retention practices. Connolly and Molinari identify four of the allegations they made in their consolidated third amended shareholder derivative petition which they argue raise a reasonable doubt that the Odyssey board acted honestly and in good faith or was adequately informed in making their business decisions: (1) the Oklahoma State Attorney's investigation; (2) demand that the Odyssey facilities in Oklahoma City, Oklahoma, Colorado Springs, Colorado, and Wichita, Kansas return to Medicare money obtained

(8) Gasmire: "Gasmire co-founded Odyssey in 1996. During his tenure at Odyssey, Gasmire served as [Odyssey's] President, CEO, Executive Vice President, COO[,] and a[sic] director. Prior to founding Odyssey, Gasmire spent three years at Vitas Healthcare, Inc., one of the largest providers of hospice services, in general management and business development roles. Gasmire's extensive healthcare background also includes a six year tenure as Vice President of Operations for United Dental Care, Inc.[,] and a seven year stay as regional manager for American Critical Care, division of American Supply Corporation."

Connolly and Molinari did not allege Wan was a seasoned member of the Odyssey board or that he had unique insight and expertise regarding the operations and legal operations of Odyssey based on his individual experience.

through improper billing an patient retention practices; (3) as reported in a *Barron's* article, during 2003, 2004, and 2005, thirty-two of Odyssey's programs exceeded the Medicare reimbursement cap and this is considered a breach of accepted practices; and (4) Odyssey had a centralized and standardized electronic information system that contained patient information and billing supervisors reviewed this information monthly in order to bill Medicare, Medicaid, or private insurance companies. They claim, based on these alleged facts, the only reasonable inference is the Odyssey board had knowledge of Odyssey's improper practices and consciously permitted the violations of the law to continue.

Relying on *Abbott Labs.* and *Biopure*, Connolly and Molinari assert that knowledge of the alleged defects in Odyssey's internal controls and the alleged Medicare and Medicaid violations can be imputed generally to the Odyssey directors. *See In re Abbott Labs. Derivative S'holders Litig.*, 325 F.3d 795, 808–09 (7th Cir.2003); *In re Biopure Corp. Derivative Litig.*, 424 F.Supp.2d 305, 308 (D.Mass.2006). The Odyssey directors and officers contend *Abbott Labs.* and *Biopure* have not been relied on by any Delaware court and we should not follow these cases. In the face of that contention, we note Connolly and Molinari do not cite us to and we have been unable to find a Delaware case incorporating or adopting the rulings of *Abbott Labs.* or *Biopure.*

In a derivative proceeding brought in the right of a foreign corporation, the requirement that the shareholder make written demand is governed by the laws of the jurisdiction where the foreign corporation is incorporated. Tex. Bus. Orgs.Code Ann. § 21.562(a) (previously Tex. Bus. Corp. Act Ann. art. 5.14, § K). We are required to apply Delaware law and, as a result, *Abbott Labs.* and *Biopure*, which are from

jurisdictions other than Delaware, are not controlling authorities. Further, in *Khanna* and *Walt Disney Co.*, the Delaware Court of Chancery has stated the facts alleged in the petition must suggest or imply the directors *knew* they were making a material decision without adequate information and without adequate deliberation, and they did not care if the decision caused the corporation and stockholders to suffer injury or loss. *See Khanna*, 2006 WL 1388744 at *25; *In re Walt Disney Co. Derivative Litig.*, 825 A.2d 275, 289 (Del. Ch.2003).

Connolly and Molinari have failed to plead particularized facts showing the Odyssey board knew or was presented with information of any wrongdoing. *See Khanna*, 2006 WL 1388744 at *25 (management objected to acquisition and expressed serious concerns about transaction). A board is not required to be informed of every fact, but to be reasonably informed, and may rely in good faith on the information, opinions, reports, or statements presented to the corporation by its officers, employees, or committees. *See* Del.Code Ann. tit. 8, § 141(e) (West Supp.2008); *Brehm*, 746 A.2d at 260. Further, Connolly and Molinari have not pleaded facts, with particularity, demonstrating the board failed to: (1) ask why it had not been informed of any wrongdoing; (2) inquire about any wrongdoing; or (3) attempt to stop or delay an action until further information could be collected. *See Walt Disney Co.*, 825 A.2d at 289. Instead, they alleged each director "would have known or at least been apprised of" Odyssey's operations and finances related to Medicare and the improper billing and patient retention practices, and "the only reasonable inference" is the Odyssey board had knowledge of Odyssey's improper practices. Connolly and Molinari's allegations are conclusory and fail

to meet the requirement to plead particularized facts. *See Khanna*, 2006 WL 1388744 at *26.

We conclude, even if the second part of the *Aronson* test applies, the trial court did not abuse its discretion when it concluded Connolly and Molinari failed to plead, with particularity, facts that raise a reasonable doubt the challenged transactions were otherwise the product of a valid exercise of business judgment.

### D. Motions to Dismiss

In their second issue, Connolly and Molinari argue the trial court erred when it granted Odyssey's, and the Odyssey directors and officers' motions to dismiss Connolly and Molinari's lawsuit because they failed to plead the futility of pre-suit demand on Odyssey's board of directors. On September 8, 2006, the trial court sustained the Odyssey directors and officers' special exceptions and ordered Connolly and Molinari to amend their petition by October 2, 2006. Rather than amend their petition, Connolly and Molinari sent a letter to the trial court advising they would not be amending their petition. As a result, the trial court dismissed their lawsuit without prejudice on October 3, 2006. Because we have already concluded the trial court did not err when it sustained the Odyssey directors and officers' special exceptions and Connolly and Molinari refused to amend their petition, the trial court did not err when it dismissed the lawsuit. *See Cole*, 864 S.W.2d at 566.

### III. CONCLUSION

The trial court did not err when it sustained the Odyssey directors and officers' special exceptions. Also, the trial court did not err when it granted Odyssey, and the Odyssey directors and officers' motions to dismiss.

The trial court's final order of dismissal without prejudice is affirmed.