**Affirmed as Modified and Opinion filed February 7, 2019.**



In The

# Fourteenth Court of Appeals

---

### NO. 14-17-00271-CV

---

## ASR 2620-2630 FOUNTAINVIEW, LP, FOUNTAINVIEW PARK PLAZA, LLC, AND ASRP INVESTMENTS, LLC, Appellants

### V.

## ASR 2620-2630 FOUNTAINVIEW GP, LLC, AMERICAN SPECTRUM REALTY OPERATING PARTNERSHIP, LP, AMERICAN SPECTRUM REALTY, INC., AND AMERICAN SPECTRUM REALTY MANAGEMENT, LLC, Appellees

---

**On Appeal from the 270th District Court
Harris County, Texas
Trial Court Cause No. 2013-25806**

---

## O P I N I O N

This appeal arises out of a partnership dispute. The limited partnership and the two class A limited partners complain that the trial court erred in rendering judgment in favor of the class B limited partner on its claim against the limited partnership for breach of the limited partnership agreement. They say the

general partner, not the limited partnership, had the duty to make the distributions at issue in this claim. The limited partnership and the two class A limited partners also assert that the trial court erred in assessing an offset against their recovery against a former general partner. We modify the judgment and affirm as modified.

## I. FACTUAL AND PROCEDURAL BACKGROUND

In 2010, the general partner and three limited partners executed a Limited Partnership Agreement (the "Agreement") in which they formed a Delaware limited partnership named ASR 2620-2630 Fountainview, LP (the "Limited Partnership"). Under the Agreement, ASR 2620-2630 Fountainview GP, LLC (the "First General Partner") was the general partner of the Limited Partnership. Fountain View Park Plaza, LLC and ASRP Investments, LLC (collectively the "Class A Partners") were the two Class A Limited Partners, and American Spectrum Realty Operating Partnership, LP (the "Class B Partner") was the sole Class B Limited Partner.

The Class A Partners became dissatisfied with the First General Partner's performance of its duties as general partner. In April 2013, the Class A Partners removed the First General Partner and selected Fountainview New GP, LLC (the "Second General Partner") to be the general partner of the Limited Partnership following the removal of the First General Partner.

The Limited Partnership and the Class A Partners (collectively the "Park Plaza Parties") filed this lawsuit, asserting claims for breach of the Agreement and breach of fiduciary duty against (1) the First General Partner, (2) the Class B Partner, (3) American Spectrum Realty, Inc., a company that is the general partner of the Class B Partner as well as the general partner of the First General

2

Partner's sole member, and (4) American Spectrum Realty Management, LLC, a property-management company retained by the First General Partner (collectively the "American Spectrum Parties").

*Agreed Temporary Injuction*

The trial court signed an agreed temporary injunction providing that any money received from the sale of two office buildings owned by the Limited Partnership was to be placed in a segregated bank account. The two buildings owned by the Limited Partnership were sold, and the proceeds were placed in the segregated bank account.

A dispute arose over entitlement to the sales proceeds. The Class B Partner filed counterclaims against the Park Plaza Parties alleging, among other things, that the Limited Partnership had breached the Agreement by failing to disburse the sales proceeds. No party, including the Class B Partner, asserted any claim against the Second General Partner, which is not a party in this litigation.

The American Spectrum Parties took issue with a payment made from the segregated bank account by Pamela Castleman, a representative of the Second General Partner. The American Spectrum Parties asserted that Castleman violated the temporary injunction by paying an improper real estate commission in the amount of $266,400 from this account to Victory Realty Solutions, Inc. Neither Castleman nor Victory Realty Solutions, Inc. is a party in this litigation.

*The Contempt Order*

The American Spectrum Parties filed a motion asking the trial court to hold Castleman in contempt. After a pre-trial evidentiary hearing, the trial court signed an order in which it granted the motion for contempt and found that Castleman caused the payment from the segregated account in violation of the

3

temporary injunction (the "Contempt Order"). The trial court found and ordered "that the appropriate remedy for Ms. Castleman's conduct is an adjustment to the jury's verdict in the amount of the funds paid out in violation of the Court orders."

*Jury Findings*

In the jury trial that followed, the jury did not find that either the First General Partner or the Class B Partner breached the Agreement. The jury found in favor of the Park Plaza Parties as to liability and damages on their breach-of-fiduciary-duty claims against the First General Partner. The jury found that the Limited Partnership failed to comply with the Agreement by not paying distributions under section 6.2 of the Agreement and that $1,197,866 fairly and reasonably would compensate the Class B Partner for its damages that resulted from the Partnership's failure to comply.[1]

*Trial Court's Judgment*

After trial, the First General Partner asked the trial court to enforce the remedy announced in the Contempt Order by deducting $266,400 from $371,147 — the total amount of damages found by the jury as to the Park Plaza Parties' breach-of-fiduciary-duty claims against the First General Partner. The Park Plaza Parties objected and argued that the trial court would err in doing so for various reasons. The trial court rendered a final judgment in which it ordered that the Park Plaza Parties recover $104,747 — the damages found by the jury "less an offset of $266,400 as set forth in the [Contempt Order]" — plus prejudgment interest and court costs. The trial court also rendered judgment that the Class B Partner recover from the Limited Partnership $1,197,866 plus

---

[1] The jury made other findings not relevant to this appeal.

4

prejudgment interest and court costs, in accordance with the jury's verdict.

## II. ISSUES AND ANALYSIS

On appeal from the trial court's judgment, the Park Plaza Parties assert two appellate issues:

1. Who owes the contractual duty to make distributions under Section 6.2 of the [Agreement]? That is, does the duty fall on the [Limited Partnership], or does it fall on the general partner instead?

2. Did the trial court err when it reduced the [Park Plaza Parties'] recovery on the verdict by $266,400 because of the acts of a non-party?

**A. Did the trial court err in rendering judgment against the Limited Partnership because the general partner, not the Limited Partnership, has the duty to make distributions under section 6.2?**

Under their first appellate issue, the Park Plaza Parties assert that the general partner, not the Limited Partnership, has the duty to make distributions under section 6.2 of the Agreement. The Park Plaza Parties assert that the trial court erred in asking the jury in Question 7 whether the Limited Partnership failed to comply with the Agreement by failing to pay distributions under section 6.2, over the Park Plaza Parties' objection that the trial court wrongly pinned on the Limited Partnership the general partner's contractual duty to make any necessary distributions under section 6.2. According to the Park Plaza Parties, only the Second General Partner had any duty to make the distribution that was the basis of the Class B Partner's breach-of-contract claim, yet the Class B Partner did not assert any claim against the Second General Partner, an entity that is not a party to this litigation. The Park Plaza Parties preserved error in the trial court on their first issue.

The First General Partner, the Class A Partners, and the Class B Partner

5

(collectively the "Partners") formed the Limited Partnership under the Delaware Revised Limited Partnership Act (the "Act"). *See* 6 Del. C. § 17–101, *et seq.* The Partners agreed that the "Agreement and the rights of the parties hereunder shall be governed by, [and] interpreted and enforced in accordance with, the internal laws (exclusive of the choice of law provisions thereof) of the State of Delaware as to all matters, including, but not limited to, matters of validity, construction, effect, performance[,] and remedies." Under the Act, a partnership agreement that provides for the application of Delaware law shall be governed by and construed under Delaware law in accordance with its terms. 6 Del. C. § 17–1101(i). The trial court ruled that Delaware law applies to the Class B Partner's claim against the Limited Partnership for breach of the Agreement. We conclude that the Act and Delaware law apply to the interpretation of the Agreement and to our analysis of the first appellate issue. *See id.*

The Act's stated policy is "to give maximum effect to the principle of freedom of contract and to the enforceability of partnership agreements." 6 Del. C. § 17–1101(c). Under the Act "[a] partnership agreement may provide for the limitation or elimination of any and all liabilities for breach of contract and breach of duties (including fiduciary duties) of a partner or other person to a limited partnership or to another partner or to an other [sic] person that is a party to or is otherwise bound by a partnership agreement; provided, that a partnership agreement may not limit or eliminate liability for any act or omission that constitutes a bad faith violation of the implied contractual covenant of good faith and fair dealing." 6 Del. C. § 17–1101(f).

Under Delaware law, the proper interpretation of language in a contract is a question of law. *Allied Capital Corp. v. GC-Sun Holdings, L.P.*, 910 A.2d 1020, 1030 (Del. Ch. 2006). When the language of a contract is plain and

unambiguous, courts give binding effect to the contract's evident meaning. *Id*. Only when the contract's language is susceptible of more than one reasonable interpretation may a court look to parol evidence; otherwise, the court must consider only the language of the contract itself in determining the intentions of the parties. *Id*. Courts construe unambiguous terms according to their ordinary and usual meaning. *Id*. Absent some ambiguity, Delaware courts will not distort or twist contract language under the guise of construing it. *Id*. When the contract language is clear and unequivocal, a party will be bound by the plain meaning of the words. *Id*.

Under section 6.2, entitled "Distribution of Partnership Capital Event Receipts," the Partners agreed that "[n]o later than fifteen (15) days after the closing of any Capital Transaction, all Partnership Capital Event Receipts (subject to requirements of applicable law with respect to the priority of other creditors of the Partnership, if any) shall be paid or distributed" according to a formula for calculating the amount of the distribution to the Class A Partners and possibly to the Class B Partner. The Park Plaza Parties do not dispute that the sale of the buildings generated Partnership Capital Event Receipts that were required to be distributed under section 6.2. The Park Plaza Parties do not assert that the evidence is insufficient to prove that under section 6.2 the Class B Partner was entitled to receive a distribution of $1,197,866 fifteen days after the closing of this sale (the "Distribution"), nor do they claim that the Class B Partner has received any part of this distribution from any entity. Instead, the Park Plaza Parties argue that the Class B Partner should have sued the Second General Partner rather than the Limited Partnership to recover the distribution owed to the Class B Partner under section 6.2.

The Park Plaza Parties assert that the Limited Partnership is not liable for

7

the failure to pay the Distribution to the Class B Partner because section 6.2 does not require the Limited Partnership to make any distribution. According to the Park Plaza Parties, only the general partner of the Limited Partnership has a duty to make a distribution under section 6.2, and therefore only the Second General Partner may be liable for the failure to pay the Distribution.

In section 6.2, the Partners used the passive voice in the critical sentence. They stated "shall be paid or distributed" without identifying which entity or entities must pay or distribute the Partnership Capital Event Receipts. The Park Plaza Parties acknowledge this use of the passive voice, and they rely on other provisions of the Agreement in support of their argument that only the general partner of the Limited Partnership has a duty to make a distribution under section 6.2. They note that under section 7.1 of the Agreement, "[t]he General Partner shall be responsible for, and shall have the exclusive right and power, at Partnership expense, to manage Partnership affairs and control all decisions relating to the business and operations of the Partnership."[2]

The American Spectrum Parties assert that under the Agreement, the Limited Partnership, rather than the general partner, is obligated to make any distributions under section 6.2. They claim the general partner is not liable for the failure to make these distributions. The American Spectrum Parties rely on section 7.5, which relieves the general partner from liability in certain circumstances:

> The General Partner shall endeavor to perform its duties under this Agreement with ordinary prudence and in a manner reasonable under the circumstances. The General Partner shall not be liable to the Partnership or the Limited Partners for any loss or liability caused by any act, or by the failure to do any act, unless such loss or liability

_____

[2] In addition to section 7.1, the Park Plaza Parties also cite sections 4.1, 4.4, 4.6, and 7.8(e).

arises from the General Partner's fraud, intentional misconduct, known violation of the law[,] or gross negligence. In no event shall the General Partner be liable by reason of a mistake in judgment made in good faith, or action or lack of action based on the advice of legal counsel. Further, the General Partner shall in no event be liable for its failure to take any action *unless it is specifically directed to take such action under the terms of this Agreement*.[3]

The American Spectrum Parties also cite (1) the phrase "distributions *from the Partnership* (pursuant to Section 6.1 and 6.2 of this Agreement)"[4] in section 1.1's definition of "Internal Rate of Return"; (2) the phrase "the amount of money distributed to such Partner *by the Partnership*"[5] in section 1.1's definition of "Capital Account"; (3) section 7.4's indemnification provision covering the general partner; and (4) section 10.12, which contains another limitation of the general partner's liability.

Section 17-606 of the Act, entitled "Right to distribution," provides as follows:

(a) Subject to §§ 17-607 and 17-804 of this title, and unless otherwise provided in the partnership agreement, at the time a partner becomes entitled to receive a distribution, he or she has the status of, and is entitled to all remedies available to, a creditor of the limited partnership with respect to the distribution.

6 Del. C. § 17–606. No party pleaded or proved the applicability of the limitation on distributions contained in section 17-607 of the Act or the limitation contained in section 17-804 of the Act. *See* 6 Del. C. §§ 17–607, 17-804. The Agreement does not provide that when a partner becomes entitled to a distribution, the partner does not have the status of a creditor of the Limited

---

[3] (emphasis added).

[4] (emphasis added).

[5] (emphasis added).

Partnership with respect to the distribution or that such a partner is not entitled to the remedies available to a creditor of the Limited Partnership with respect to the distribution. Therefore, even presuming that no language in the Agreement imposes on the Limited Partnership a duty to make the Distribution under section 6.2 of the Agreement, under section 17-606 of the Act, because the Agreement does not provide otherwise,[6] when the Class B Partner became entitled to receive the Distribution, the Class B Partner became a creditor of the Limited Partnership with respect to the Distribution, and was entitled to assert a claim against the Limited Partnership for breach of the Agreement by failing to pay the Distribution owed under section 6.2. *See* 6 Del. C. § 17–606; *Schuss v. Penfield Partners, L.P.*, No. 3132-VCP, 2008 WL 2433842, at \*4 (Del. Ch. Jun. 13, 2008) (not designated for publication).[7]

In the *Schuss* case, limited partners withdrew from a limited partnership and were entitled to receive a distribution under section 10.01 of the limited partnership agreement, a provision that used the passive voice "shall be paid or distributed," without stating which entity or entities must do the paying or distributing. *See Schuss*, 2008 WL 2433842, at \*2, 6. The limited partnership agreement contained a provision limiting the liability of the general partner of the limited partnership. *See id*. at \*2. The limited partners received a distribution, but they alleged a breach of the partnership agreement based on the failure to make "a full and timely final distribution" and on the failure to make "ratable, in kind distributions." *See id*. at \*4.

---

[6] Neither the sections of the Agreement cited by the Park Plaza Parties nor the remaining provisions of the Agreement provide otherwise.

[7] Under Delaware law, unpublished opinions from the Court of Chancery are precedential. *See Case Fin., Inc. v. Alden,* No. 1184–VCP, 2009 WL 2581873, at \*6, n. 39 (Del. Ch. Aug. 21, 2009) (not designated for publication); *Connolly v. Gasmire,* 257 S.W.3d 831, 841 n.6 (Tex. App.—Dallas 2008, no pet.).

The limited partners asserted a breach-of-fiduciary-duty claim against the general partner in a way that did not conflict with the limitation of the general partner's liability. *See id*. at *2–3. But, the limited partners did not assert a claim against the general partner for breach of the partnership agreement; instead, the general partners claimed that the limited partnership breached the partnership agreement. *See id*. at *3–4. The limited partnership moved to dismiss for failure to state a claim, asserting that the limited partnership could not be liable for breach of the partnership agreement because the partnership was not a party to the limited partnership agreement and because the limited partners had not alleged that the partnership did anything to cause a breach of the agreement. *See id*. at *4. The Delaware chancery court concluded that under section 17-606 of the Act, the limited partners had the status of creditors of the limited partnership with respect to the distributions, and the limited partnership had to pay the distributions to the limited partners and thus could be sued for breach of the partnership agreement. *See id*. The chancery court did not base its ruling on any language in the limited partnership agreement purportedly imposing on the limited partnership a duty to make the distribution. *See id*.

Citing various Delaware cases, the Park Plaza Parties assert that a limited partner can seek to resolve a dispute over a distribution by seeking declaratory relief, an injunction, or money damages against the general partner. The cited cases do not conflict with our analysis of the first issue, and a limited partner's ability to seek various forms of relief against the general partner does not mandate the conclusion that the limited partner may not sue the limited partnership for breach of the partnership agreement based on its failure to pay a distribution owed to the limited partner.

11

We conclude that under section 17-606 of the Act, when the Class B Partner became entitled to receive the Distribution, the Class B Partner became a creditor of the Limited Partnership with respect to the Distribution, and was entitled to assert a claim against the Limited Partnership for breach of the Agreement by failing to pay the Distribution owed under section 6.2. *See* 6 Del. C. § 17–606; *Schuss*, 2008 WL 2433842, at *2–4. Accordingly, we overrule the Park Plaza Parties' first issue.

**B.    Did the trial court err by reducing the Park Plaza Parties' recovery of damages against the First General Partner by $266,400 to punish a non-party for her contempt of court in violating the temporary injunction?**

Under their second issue, the Park Plaza Parties assert that the trial court erred in reducing the amount of their recovery against the First General Partner by $266,400 based on Castleman's contempt of court in violating the trial court's temporary injunction. The American Spectrum Parties took issue with the payment Castleman made from the segregated bank account. They asserted that Castleman violated the temporary injunction by paying an improper real estate commission to Victory Realty Solutions, Inc., a corporation Castleman owns.

The American Spectrum Parties filed a motion asking the trial court to hold Castleman in contempt. After a pre-trial evidentiary hearing on the motion, the trial court signed the Contempt Order, finding that Castleman caused the payment from the segregated account in violation of the temporary injunction. In the Contempt Order, the trial court found "that a fine or incarceration would not be appropriate punishment for such contempt." The court found and ordered "that the appropriate remedy for Ms. Castleman's conduct is an adjustment to the jury's verdict in the amount of the funds paid out in violation of the Court

12

orders." The jury found that a total of $371,147 would fairly and reasonably compensate the Park Plaza Parties for their damages that were proximately caused by the First General Partner's breach of fiduciary duty. In its final judgment, the trial court ordered that the Park Plaza Parties recover $104,747 — $371,147 (the damages found by the jury) "less an offset of $266,400 as set forth in the [Contempt Order]" — plus prejudgment interest and court costs.

No party has proved or obtained a jury finding as to any alter-ego theory or basis for piercing any entity's corporate veil. Thus, even presuming that Castleman controlled the Second General Partner and the Class A Partners, each of which are limited liability companies, we still must treat each actor involved in this case as a separate legal entity. *See Sherman v. Boston*, 486 S.W.3d 88, 94 (Tex. App.—Houston [14th Dist.] 2016, pet. denied) (concluding that limited liability company was a legal entity separate from its sole member); *Peterson Group, Inc. v. PLTQ Lotus Group, L.P.*, 417 S.W.3d 46, 58–59 (Tex. App.—Houston [1st Dist.] 2013, pet denied) (concluding that, though alter-ego and corporate-veil-piercing theories generally do not apply in the context of limited partnerships, if these theories were to apply and were proved, they would make a limited partner or a person in control of the limited partnership's business responsible for the liabilities of the limited partnership); *Daniels v. Empty Eye, Inc.*, 368 S.W.3d 743, 752 (Tex. App.—Houston [14th Dist.] 2012, pet. denied) (holding that Mr. Daniels, a limited partner who also was president of the corporation serving as general partner of the limited partnership, was an entity distinct from the corporate general partner); *In re BPZ Resources, Inc.*, 359 S.W.3d 866, 876 n.6 (Tex. App.—Houston [14th Dist.] 2012 [mand. denied], orig. proceeding) (treating two affiliated corporations as distinct legal entities even though the real parties in interest alleged an alter ego theory and sought to

pierce the corporate veil, because the real parties in interest did not prove these allegations); *Watkins v. Basurto*, No. 14-10-00299-CV, 2011 WL 1414135, at *7 (Tex. App.—Houston [14th Dist.] Apr. 14, 2011, no pet.) (mem. op.) (concluding that alter-ego and corporate-veil-piercing theories apply in the context of limited liability companies); *WesternGeco, L.L.C. v. Input/Output, Inc.*, 246 S.W.3d 776, 785 (Tex. App.—Houston [14th Dist.] 2008, no pet.) (treating two corporations as separate entities because no party pleaded or proved a theory for piercing the corporate veil).

We presume for the purposes of our analysis that (1) Castleman violated the temporary injunction by paying an improper real estate commission in the amount of $266,400 from the segregated account to Victory Realty Solutions, Inc.; (2) without addressing the punishment for the criminal contempt, the trial court properly held Castleman in criminal contempt based on her violation of the temporary injunction;[8] and (3) this court should review the trial court's offset of the $266,400 against the Park Plaza Parties' recovery against the First General Partner under an abuse-of-discretion standard. Even under these presumptions, the trial court still abused its discretion by offsetting an amount that Castleman withdrew from the segregated account (which did not contain funds owned by the First General Partner) and paid to Victory Realty Solutions, Inc. against the First General Partner's liability to the Park Plaza Parties (none of whom is Castleman or Victory Realty Solutions, Inc.). *See Western Shoe Co. v. Amarillo Nat. Bank*, 94 S.W.2d 125, 128 (Tex. 1936) (holding that for one obligation to

---

[8] Courts use civil contempt to coerce parties to comply with a court order, usually through a conditional penalty. *See Khan v. Valliani*, 439 S.W.3d 528, 536 (Tex. App.—Houston [14th Dist.] 2014, no pet.). There is no express statutory limit to the fine or confinement that a court can impose by a civil-contempt order. *See id.* If a fine is assessed in a civil-contempt order, the court cannot order that the fine be paid to a private litigant. *See id.* In today's case, the trial court did not use its civil-contempt power. *See id.*

be offset against another there must be mutuality; in other words, the obligor of the first obligation must be the obligee of the second obligation and the obligee of first obligation must be the obligor of the second obligation); *FDIC v. Projects American Corp.*, 828 S.W.2d 771, 772–73 (Tex. App.—Texarkana 1992, writ denied) (same as *Western Shoe Co*).

The American Spectrum Parties assert that Castleman was in contempt of court based on her violation of the temporary injunction by her improper withdrawal of $266,400 from the Limited Partnership's segregated bank account and her payment of this amount to Victory Realty Solutions, Inc., a company she owned. The American Spectrum Parties argue that the offset ordered by the trial court was a penalty for contempt of court that the trial court had discretion to order, so the trial court did not abuse its discretion in determining that the appropriate equitable remedy for this contempt of court is a reduction of the Park Plaza Parties' recovery against the First General Partner. According to the American Spectrum Parties, it would not be equitable to allow the Class A Partners to avoid any consequences for Castleman's violation of the temporary injunction. They also assert that Castleman controls the Class A Partners and is their agent. But even presuming that Castleman controlled the Class A Partners and sometimes acted as their agent, no witness testified at the contempt hearing that Castleman was acting on behalf of the Class A Partners when she withdrew the $266,400 from the segregated bank account and had that amount paid to Victory Realty Solutions, Inc. Nor did the trial court find that Castleman was acting on behalf of either of the Class A Partners when she engaged in this contemptuous conduct.

The American Spectrum Parties cite *Downer v. Aquamarine Operators, Inc.*, a case in which the Supreme Court of Texas affirmed the trial court's

death-penalty discovery sanction under Texas Rule of Civil Procedure 215. *See* 701 S.W.2d 238, 240–43 (Tex. 1985). The *Downer* court held that the trial court had authority to issue the sanction based on the failure of the defendant's president to appear for a deposition, relying on a procedural rule that covered the failure to appear for deposition of "a party or an officer or managing agent of a party." *Id*. at 241. Today's case does not involve such a rule, nor does it involve death-penalty discovery sanctions. The *Downer* case is not on point. *See id*. at 240–43.

The American Spectrum Parties also cite *State v. Texas Pet Foods, Inc.*, a case in which the Supreme Court of Texas concluded that when a jury finds statutory violations occurring and continuing up to or near the trial date, in making the equitable determination as to whether to issue a permanent injunction, the trial court may determine that the defendant has engaged in a settled course of conduct and may assume that this conduct will continue, absent clear proof to the contrary. *See* 591 S.W.2d 800, 804 (Tex. 1979). The American Spectrum Parties assert that the trial court's equitable determination in *Texas Pet Foods* as to whether the defendant was likely to engage in that conduct in the future is analogous to the trial court's decision in today's case to remedy Castleman's contemptuous conduct by offsetting $266,400 against the Park Plaza Parties' recovery against the First General Partner. *See id*. Though *Texas Pet Foods* involved equitable issues as to whether the trial court erred in issuing a permanent injunction, that case did not involve contempt of court, the proper punishment for contemptuous conduct, or the propriety of an offset against a party's recovery. *See id*. at 803–05. The *Texas Pet Foods* case is not on point. *See id*. at 240–43.

Even presuming the trial court had the authority to punish Castleman's

criminal contempt by a means other than a fine or confinement in jail, the trial court still abused its discretion in punishing Castleman's contemptuous conduct by assessing an offset against the recovery of three distinct legal entities, none of whom is Castleman or Victory Realty Solutions, Inc. *See Western Shoe Co.*, 94 S.W.2d at 128; *Sherman*, 486 S.W.3d at 94; *Daniels*, 368 S.W.3d at 752; *WesternGeco, L.L.C.*, 246 S.W.3d at 785; *Projects American Corp.*, 828 S.W.2d at 772–73. In addition, under Texas Government Code section 21.002, the only punishments the trial court could properly assess for Castleman's criminal contempt were a fine of not more than $500, confinement in the county jail for not more than six months, or both. *See* Tex. Gov't Code Ann. § 21.002(b) (West, Westlaw through 2017 1st C.S.). Longstanding, binding precedent construing this statute or one of its predecessors holds that the only punishments available for criminal contempt are a fine, confinement in jail, or both, and that civil damages may not be awarded to a private party as punishment for contempt because such damages are not a fine. *See* Tex. Gov't Code Ann. § 21.002(b); *Cannan v. Green Oak Apts.*, 758 S.W.2d 753, 754 (Tex. 1988); *Edrington v. Pridham*, 65 Tex. 612, 617–18 (1886); *Khan v. Valliani*, 439 S.W.3d 528, 536–37 (Tex. App.—Houston [14th Dist.] 2014, no pet.); *In re Hereweareagian, Inc.*, 383 S.W.3d 703, 710 (Tex. App.—Houston [14th Dist.] 2012, orig. proceeding).

We conclude that the trial court abused its discretion by reducing the amount of the Park Plaza Parties' recovery against the First General Partner by $266,400 based on Castleman's contempt of court in violating the trial court's temporary injunction. Accordingly, we sustain the Park Plaza Parties' second issue.

### III. CONCLUSION

Under section 17-606 of the Act, when the Class B Partner became entitled

17

to receive the Distribution, the Class B Partner became a creditor of the Limited Partnership with respect to the Distribution and was entitled to assert a claim against the Limited Partnership for breach of the Agreement by failing to pay the Distribution owed under section 6.2 of the Agreement. Thus, the trial court did not err in rejecting the complaint asserted under the Limited Partnership's first issue. The trial court abused its discretion by reducing the amount of the Park Plaza Parties' recovery against the First General Partner by $266,400 based on Castleman's contempt of court in violating the trial court's temporary injunction. We therefore modify the trial court's judgment by deleting this offset so that the principal amount of the Park Plaza Parties' recovery against the First General Partner is $371,147, and we affirm the judgment as modified.


/s/    Kem Thompson Frost
Chief Justice


Panel consists of Chief Justice Frost and Justices Bourliot and Poissant.[9]

---

[9] Originally, this case was submitted with oral argument to a panel consisting of Chief Justice Frost and Justices Jamison and Donovan. Before the court decided this case, Justices Jamison and Donovan ceased serving as justices on this court, and this case was resubmitted without oral argument to the current panel of Chief Justice Frost and Justices Bourliot and Poissant.