**AFFIRMED; Opinion Filed September 28, 2020**



In The

# Court of Appeals
## Fifth District of Texas at Dallas

___

### No. 05-19-00260-CV

___

**CITY OF WARREN POLICE AND FIRE RETIREMENT SYSTEM AND JANICE STEWART, Appellants**

**V.**

**TENET HEALTHCARE CORPORATION, JAMES A. UNRUH, RONALD A. RITTENMEYER, BRENDA J. GAINES, KAREN M. GARRISON, RICHARD R. PETTINGILL, J. ROBERT KERREY, EDWARD A. KANGAS, FREDA C. LEWIS-HALL, TAMMY ROMO, MATTHEW J. RIPPERGER, RANDOLPH C. SIMPSON, TREVOR FETTER, DANIEL CANCELMI, R. SCOTT RAMSEY, J. MCDONALD WILLIAMS, JOHN ELLIS BUSH, AND BIGGS C. PORTER, Appellees**

___

**On Appeal from the 14th Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. DC-16-15118**

___

## MEMORANDUM OPINION
Before Justices Molberg, Carlyle, and Browning[1]
Opinion by Justice Carlyle

In this shareholder derivative action, appellants—two Tenet Healthcare

Corporation shareholders—asserted claims for breach of fiduciary duty, corporate

___

[1] The Honorable David L. Bridges, Justice, participated in the submission of this appeal; however, he did not participate in the issuance of this opinion due to his death on July 25, 2020. Justice Browning has substituted for Justice Bridges and has reviewed the record and the briefs in this cause.

waste, unjust enrichment, and gross mismanagement against appellees, who are current and former Tenet directors and officers.[2] Appellees filed special exceptions based on appellants' alleged failure to adequately plead that a pre-suit litigation demand on Tenet's board of directors was excused as futile. The trial court granted appellees' special exceptions and, after appellants declined to replead, dismissed the action with prejudice.

In two issues on appeal, appellants contend they sufficiently pleaded demand futility and the trial court erred by granting appellees' special exceptions and dismissing the petition. We affirm in this memorandum opinion. *See* TEX. R. APP. P. 47.4.

**Background**

Tenet, a Nevada corporation, operates hospitals and outpatient centers throughout the United States. At the time of the complained-of events, Tenet operated about 77 hospitals and 183 outpatient centers nationwide. Its board of directors (the Board) consisted of fourteen members elected annually by its shareholders.

According to appellants' February 2017 live petition, (1) in June 2006, Tenet "entered into a $900 million settlement with the United States to resolve the Company's False Claims Act liability for engaging in alleged unlawful Medicare

---

[2] Nominal defendant Tenet Healthcare Corporation is also an appellee.

billing practices"; (2) as part of the 2006 settlement, Tenet "agreed to a Corporate Integrity Agreement ('CIA') with the Department of Health and Human Services' Office of the Inspector General to ensure that all Tenet facilities complied with Medicare and Medicaid program requirements," including the "federal False Claims Act and Anti-Kickback Statute"; and (3) the CIA required, among other things, that "Tenet strengthen its policies, procedures and controls for contracts with referral sources to ensure compliance with the Anti-Kickback Statute."

Appellants further alleged that from 2000 "until at least 2013," four Tenet hospitals in Georgia and South Carolina "systematically paid healthcare kickbacks and bribes to Hispanic Medical Management d/b/a Clinica de la Mama ('Clinica') in return for Clinica's agreement to send patients, mostly undocumented Hispanic women, to Tenet facilities for medical services related to labor and delivery that were paid for by the Medicaid and Medicare programs." The petition stated that "although undocumented pregnant women are not eligible for regular Medicaid coverage," Tenet benefitted from those referrals because undocumented patients "can qualify for emergency medical assistance when they deliver their babies" and Tenet hospitals "included the Medicaid-ineligible women when seeking additional Medicaid funds intended to support hospitals that treat a large number of low-income patients." According to the petition, Tenet "unlawfully obtained more than $145 million in Medicaid and Medicare program funds as a result of [that] patient referral scheme" and, on October 3, 2016, (1) "was forced to pay $513 million to resolve its

federal False Claims Act and Anti-Kickback Statute liability for defrauding the United States and paying bribes to Clinica in exchange for patient referrals" and (2) "entered into an onerous Non-Prosecution Agreement ('NPA')" with the U.S. Department of Justice and the U.S. Attorney's Office for the Northern District of Georgia.[3]

The petition contended that "[a]s Tenet's directors and top officers,"[4] appellees owed Tenet and its shareholders "a fiduciary duty of loyalty to direct the operations of the Company and its subsidiaries and hospitals in conformity with the laws applicable to its business," but "breached their fiduciary duties of legal compliance and candor by acting disloyally towards Tenet." Specifically, "[w]hile under [appellees'] stewardship, Tenet adopted billing and contract review policies, procedures and controls, and/or deployed such policies, procedures and controls, such that multiple Tenet hospitals regularly paid kickbacks to prenatal care clinic

---

[3] Appellants' petition quoted portions of the NPA's "Statement of Facts" in support of the petition's factual allegations.

[4] According to the petition, Mr. Unruh "has been a director of Tenet since 2004"; Mr. Rittenmeyer "has been a director of Tenet since 2010"; Ms. Gaines "has been a director of Tenet since March 2005"; Ms. Garrison "has been a director of Tenet since March 2005"; Mr. Pettingill "has been a director of Tenet since March 2004"; Mr. Kerrey "served as a director of Tenet since November 2012 (he previously served as a director from March 2001 to March 2012 as well)"; Mr. Kangas "has been a director of Tenet since April 2003"; Ms. Lewis-Hall "has been a director of Tenet since December 2014"; Ms. Romo "has been a director of Tenet since March 2015"; Mr. Ripperger "has been a director of Tenet since January 2016"; Mr. Simpson "has been a director of Tenet since January 2016"; Mr. Fetter "has been Tenet's CEO since September 2003" and "has been a director of Tenet since 2003"; Mr. Cancelmi "has been Tenet's CFO since September 2012"; Mr. Ramsey "has been Tenet's CAO, Vice President and Controller since September 2012"; Mr. Williams "served as a director of Tenet from March 2005 to May 2010"; Mr. Bush "served as a director of Tenet from April 2007 to December 2014"; and Mr. Porter "served as Tenet's CFO from June 2006 to March 2012." The petition also described the required duties of the Board's Audit Committee and Compliance Committee and alleged that seven of the defendants had served on at least one of those two committees during the relevant time period.

operators in exchange for patient referrals with impunity" and "issued materially false and misleading" financial reports that (1) "misrepresented that Tenet had effective internal controls for legal compliance when, in fact, it did not," and (2) failed to disclose that Tenet had "obtained millions of dollars in revenues by defrauding the United States and paying bribes and kickback in exchange for patient referrals" and "improperly recorded the unlawful payments as legitimate expenses in Tenet's consolidated financial statements and financial reports." The petition stated,

> As a result of their access to and review of internal corporate documents, or conversations and connections with other corporate officers, employees, and directors and attendance at management and/or Board meetings, each of the defendants knew, or was reckless in not knowing, the adverse, material, non-public facts about Tenet's patient referral kickback scheme and/or the false and misleading consolidated financial results and financial statements complained of herein.

Appellants alleged appellees "collectively pocketed well over $100 million in salaries, fees, stock and other incentive-based compensation not justified in light of the serious breaches of fiduciary duty and violations of federal law that have occurred during their watch." Thus, appellants asserted, a majority of Tenet's directors are "disabled from considering a demand" and "[a]ccordingly, a pre-suit demand on the Tenet Board to commence, let alone vigorously prosecute, this action is a useless and futile act, and is therefore excused."

Appellees filed a brief in support of their special exceptions[5] in which they asserted, among other things, (1) "[a]ccording to the government's factual recitation on which the Petition relies," employees of four Tenet hospitals in Georgia and South Carolina "created contractual agreements with Clinica as a 'pretextual mechanism' to make illegal payments in exchange for patient referrals, 'concealed material facts from Tenet lawyers and outside counsel because they knew that the agreements would not be approved if the true nature of the Clinica arrangements were disclosed to the lawyers,' and facilitated payments to Clinica 'in violation of then-existing company policies and controls governing the disbursement of monies to referral sources,'" and (2) "[w]hen this misconduct came to light, Tenet cooperated with the government in its investigation, disclosed the investigation to its shareholders, and resolved the matter by, among other things, paying a monetary settlement and enhancing its controls, policies, and monitoring procedures."

Appellees contended appellants' effort to adequately plead demand futility failed because appellants did not "plead particularized facts giving rise to an inference that any member of the Board faces a substantial likelihood of personal liability for intentional misconduct, fraud, or a knowing violation of law." Consequently, appellants "lack standing to bring claims on behalf of Tenet and this case cannot proceed." Appellees also asserted "Plaintiffs' failure to plead

---

[5] About a month after appellees timely filed their answer and special exceptions, the trial court stayed this case pending resolution of a federal securities class action based on the same underlying allegations. One year later, the federal securities class action was dismissed with prejudice and this case resumed.

particularized facts on a director-by-director basis showing knowledge of the illegal payments to Clinica renders the Petition defective as a matter [of] law, and Defendants' special exceptions can be granted on this basis alone." Appellees relied primarily on two cases from this Court: *In re Brick*, 351 S.W.3d 601 (Tex. App.—Dallas 2011, orig. proceeding), and *Connolly v. Gasmire*, 257 S.W.3d 831 (Tex. App.—Dallas 2008, no pet.).

Appellants filed an "Opposition" to appellees' special exceptions, asserting in part (1) "[a]lthough not directly involving the Clinica kickback scheme, the CIA's requirements directly addressed the same type of misconduct"; (2) Tenet's "extensive internal controls," i.e., "the specific duties and responsibilities required by the CIA that were implemented," "would have uncovered the illegal kickbacks to Clinica and brought this information to management and the Board"; (3) the petition's allegations "demonstrate that a majority of the directors on Tenet's Board at the time the Petition was filed face a substantial likelihood of liability for consciously failing to stop the illegal bribes and kickback payments to Clinica"; and (4) "the size and duration of the Clinica kickback scheme also supports the reasonable inference that Defendants . . . had knowledge of the scheme." The attachments to that document included the NPA's Statement of Facts.

In reply, appellees contended that "[e]ven setting aside Plaintiffs' failure to plead on a director-by-director basis, Plaintiffs do not come close to pleading that any member of the Board knew of illegal conduct and allowed it to continue," but

rather "ask [the trial court] to assume such knowledge" under theories rejected in *Brick* and *Connolly*.

At the hearing on appellees' special exceptions, appellants' counsel argued in part (1) "this process that was enacted by the CIA and that the corporate Board at Tenet agreed to implement was implemented; it's not even contested," and (2) under *Brick*, "we can say that there are people on the Board committee and that that committee met at certain times and promised it would do so, certified in SEC filings that it had met its obligations under the 2006 CIA, and that is sufficient for pleading that each director gained knowledge through those meetings and through that process."

Following the hearing, the trial court signed an order granting appellees' special exceptions based on appellants "failing to meet the 'demand futility' standards articulated by the Dallas Court of Appeals in *In re Brick*." Appellants moved for limited discovery for the purpose of meeting the applicable pleading requirements, but the trial court denied that motion. Appellants then elected not to replead.

**Standard of review and applicable law**

We reverse a trial court's ruling on special exceptions only if there has been an abuse of discretion.[6] *Connolly*, 257 S.W.3d at 838. "However, even under the

---

[6] Though appellants contend abuse-of-discretion review is "inappropriate" here under "substantive Nevada law," "[t]he standard of review is a procedural question to which we apply Texas law." *Gator*

–8–

abuse of discretion standard, we review the trial court's determination of legal questions de novo." *Gatten v. McCarley*, 391 S.W.3d 669, 673 (Tex. App.—Dallas 2013, no pet.); *see also Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241–42 (Tex. 1985) (explaining trial court abuses its discretion when it fails to analyze or apply law correctly). If a trial court properly sustains special exceptions and the plaintiff does not amend the pleadings, the trial court does not err by dismissing the cause of action. *Connolly*, 257 S.W.3d at 838.

The parties do not dispute that Nevada law governs the substantive aspects of our demand futility analysis. *See* TEX. BUS. ORGS. CODE § 21.562(a) (in derivative proceeding brought in right of foreign corporation, requirement that shareholder make written demand is governed by law of jurisdiction where foreign corporation is incorporated). Under Nevada law, a corporation's board of directors ordinarily "has full control over the affairs of the corporation," including whether to take legal action on the corporation's behalf. *Shoen v. SAC Holding Corp.*, 137 P.3d 1171, 1178–79 (Nev. 2006), *abrogated on other grounds by Chur v. Eighth Judicial Dist. Court in & for Cty. of Clark*, 458 P.3d 336 (Nev. 2020). Nonetheless, when the board fails to appropriately act, individual shareholders may file a derivative suit, which allows shareholders to "compel the corporation to sue" and to thus pursue litigation on the corporation's behalf against the corporation's board of directors and officers.

*Apple, LLC v. Apple Tex. Rests., Inc*., 442 S.W.3d 521, 530 n.4 (Tex. App.—Dallas 2014, pet. denied); *accord Connolly*, 257 S.W.3d at 838.

*Id*. at 1179. Nevada's "heightened pleading imperatives in shareholder derivative suits" require a derivative complaint to "state, with particularity, the demand for corrective action that the shareholder made on the board of directors (and, possibly, other shareholders) and why he failed to obtain such action, or his reasons for not making a demand." *Id*. (citing NEV. R. CIV. P. 23.1); *see also* NEV. REV. STAT. § 41.520.

In analyzing demand futility, Nevada courts generally follow the approach and reasoning of Delaware law. *Shoen*, 137 P.3d at 1179–80, 1184. Thus, "as the Delaware Supreme Court has recognized in a similar shareholder demand context, a shareholder must 'set forth . . . particularized factual statements that are essential to the claim' that a demand has been made and refused, or that making a demand would be futile or otherwise inappropriate." *Id*. at 1179–80. Though the shareholder "is not required to plead evidence," "mere conclusory assertions will not suffice under NRCP 23.1's 'with particularity' standard." *Id*. at 1180; *see also Brick*, 351 S.W.3d at 604 ("The shareholder has the burden to adequately plead demand futility with particularized facts. The pleading standard for demand futility requires a fact-intensive, director-by-director analysis." (citing *Postorivo v. AG Paintball Holdings, Inc*., Nos. 2991-VCP, 3111-VCP, 2008 WL 553205, at *6–7 (Del. Ch. Feb. 29, 2008) (mem. op.), and other Delaware cases)); *Connolly*, 257 S.W.3d at 840 (same).

Nevada courts must also examine whether particularized facts demonstrate (1) "in those cases in which the directors approved the challenged transactions, a

reasonable doubt that the directors were disinterested or that the business judgment rule otherwise protects the challenged decisions" (the *Aronson* test); or (2) "in those cases in which the challenged transactions did not involve board action or the board of directors has changed since the transactions, a reasonable doubt that the board can impartially consider a demand" (the *Rales* test). *Shoen*, 137 P.3d at 1184 (citing *Aronson v. Lewis*, 473 A.2d 805, 814 (Del. 1984), *overruled on other grounds by Brehm v. Eisner*, 746 A.2d 244 (Del. 2000); *Rales v. Blasband*, 634 A.2d 927, 934 (Del. 1993)). "[I]n practice, the *Aronson* and *Rales* 'disinterested and independent' tests often amount to the same analysis—i.e., whether directorial interest in the challenged act or the outcome of any related litigation negates impartiality to consider a demand." *Id*. at 1184 n.62.

Further, "to show interestedness, a shareholder must allege that a majority of the board members would be 'materially affected, either to [their] benefit or detriment, by a decision of the board, in a manner not shared by the corporation and the stockholders.'" *Id*. at 1183; *see also id*. at 1184 n.62 ("[W]hen considering whether the 'majority' of an even-numbered board is incapable of impartially considering a demand under the tests for demand futility, the 'majority' equals at least one-half of that board."). Allegations of "mere threats of liability through approval of the wrongdoing or other participation" do not show sufficient interestedness to excuse the demand requirement. *Id*. at 1183. "Instead, as the Delaware courts have indicated, interestedness because of potential liability can be

–11–

shown only in those 'rare case[s] . . . where defendants' actions were so egregious that a substantial likelihood of director liability exists.'" *Id.* at 1183–84. "And directors and officers may only be found personally liable for breaching their fiduciary duty of loyalty if that breach involves intentional misconduct, fraud, or a knowing violation of the law." *Id.* at 1184 (citing NEV. REV. STAT. § 78.138(7)). Consequently, "interestedness through potential liability is a difficult threshold to meet." *Id.*

### Appellants failed to adequately plead demand futility

Here, both parties assert this case "implicates" the *Rales* test. *See* 634 A.2d at 934. We agree.[7] That test "inquires whether the complaint's particularized facts show that the board is incapable of impartially considering a demand—i.e., that a majority of the board members are interested in the decision to act on the demand or dependent on someone who is interested in that decision." *Shoen*, 137 P.3d at 1185.

Appellants contend (1) "despite the rigorous oversight imposed by the CIA and overseen by Defendants, Tenet's bribes-for-referrals-of-pregnant-women scheme continued unabated throughout the five-year term of the CIA and persisted until at least 2013, giving rise to a 'reasonabl[e] infer[ence] that the Board had consciously disregarded [Tenet]'s commitments under the [CIA] and its own oversight responsibilities'" (quoting *Horman v. Abney*, No. 12290-VCS, 2017 WL

---

[7] *See Shoen*, 137 P.3d at 1184–85 ("Since, for the most part, appellants have alleged a failure to properly supervise or a willful disregard of duties, they do not challenge any board-considered business decision. Therefore, the *Rales* test applies.").

–12–

242571, at *11 (Del. Ch. Jan. 19, 2017) (mem. op.)); (2) "[i]t is that inference that raises a 'substantial likelihood' of liability as to a majority of the current board and excuses demand"; and (3) "[t]hat inference is also supported by the magnitude and duration of the alleged wrong." Appellants further assert the trial court's ruling implies it "adopted an extreme reading of *Brick*" that required "direct—rather than inferential—allegations of knowledge and a unique showing as to each individual director," neither of which, according to appellants, is required by Delaware or Nevada law.

In *Horman*, United Parcel Service (UPS) entered into a 2005 "Assurance of Discontinuance Agreement" (AOD) with the government in which UPS agreed to comply with laws regarding the prohibited shipment of untaxed cigarettes from retailers on Native American reservations and establish effective monitoring systems going forward. *Horman*, 2017 WL 242571, at *3. The shareholder plaintiffs alleged that after about five years of compliance, the director defendants "began to ignore their oversight responsibilities and UPS began to operate in violation of the AOD and applicable state and federal laws governing the shipment of cigarettes." *Id*. at *4. The shareholders contended the directors "breached their duty of loyalty owed to UPS and its stockholders" by "willfully, consciously recklessly, and intentionally failing to perform their duties of oversight to ensure the Company's compliance with positive law." *Id*. at *7. The directors moved to dismiss the complaint for failure to adequately plead demand futility. *Id*. at *1.

The court in *Horman* stated that on a motion to dismiss pursuant to Rule 23.1, the court "accepts well-pled allegations as true, and makes reasonable inferences in favor of the plaintiff," but "[g]iven the heightened requirements of Rule 23.1, . . . conclusory allegations of fact or law not supported by allegations of specific fact may not be taken as true." *Id*. at *6. The court observed that "Delaware courts routinely reject the conclusory allegation that because illegal behavior occurred, internal controls must have been deficient, and the board must have known so." *Id*. at *7. "Rather, a plaintiff must plead with particularity a sufficient connection between the corporate trauma and the board." *Id*. One way to do so is to "plead that the board knew of evidence of corporate misconduct—the proverbial 'red flag'—yet acted in bad faith by consciously disregarding its duty to address that misconduct." *Id*.

Though the *Horman* shareholders argued the AOD itself served as a red flag, the court disagreed, noting that typically "the red flag analogy depicts events or reports that serve as warning signs to the Board of corporate wrongdoing after a system of reporting and compliance is in place." *Id*. at 11. The court stated:

> There might well be a reasonably conceivable scenario where the AOD itself could have taken the form of a red flag. For instance, if UPS had entered the AOD in 2005 and then continued a pattern of non-compliant shipments immediately thereafter and through 2014, one might reasonably infer that the Board had consciously disregarded UPS's commitments under the AOD and its own oversight responsibilities. But that is not what Plaintiffs have alleged.

*Id*.

–14–

The court then addressed the shareholders' argument that a 2010 report to UPS's Audit Committee by UPS's vice president of its legal department constituted a red flag sufficient to establish demand futility. *Id.* Specifically, the shareholders contended the VP's presentation "reviewed significant matters and trends" and it was reasonable to infer that the VP, "given his authority and knowledge under the [AOD], his direct reporting relationship with the Audit Committee, and his status of Vice Secretary of the Audit Committee . . . , knew of UPS's abandonment of its obligations under the [AOD] and reported the same to the Audit Committee in November 2010." *Id.* The court rejected that argument, stating:

> Plaintiffs would have the Court make two inferential leaps here: (1) [the VP] knew of compliance issues related to the AOD; and (2) he reported those issues to the Audit Committee.
>
> Plaintiffs' invitation to play inferential hopscotch does not comport with Rule 23.1's "stringent requirements of factual particularity." While the Court must "draw all reasonable inferences in the plaintiff's favor," our Supreme Court has made clear that "conclusory allegations are not considered as expressly pleaded facts or factual inferences." Even reasonable inferences "must logically flow from particularized facts alleged by the plaintiff." Plaintiffs' allegations that [the VP] had knowledge of the AOD because he was charged with the ultimate responsibility to implement it, and that he must have advised the Audit Committee that UPS had abandoned its obligations when he reported on "significant matters and trends," are both wholly conclusory. Plaintiffs have not tied these allegations to any particularized facts about what [the VP] knew, when he knew it or what he actually told the Audit Committee.

*Id.* at *12 (quoting *Wood v. Baum*, 953 A.2d 136, 140 (Del. 2008); *Brehm*, 746 A.2d at 254).

–15–

Here, appellants contend *Horman* "supports a 'reasonabl[e] infer[ence]' of conscious disregard by the Board." They assert (1) "[w]hile the CIA did not identify Clinica by name, in *Horman*, . . . UPS did not enter an agreement not to ship from specific tribes to specific customers—it committed to not do it all"; (2) "[t]hus, *Horman* recognized that a failure to stop that general category of misconduct supported an inference of conscious disregard"; and (3) "[s]o, too, here, where the CIA was not specific to particular referral agreements; it broadly required careful analysis of all such agreements, and Defendants consciously disregarded their duty to halt them."

Though *Horman* described a hypothetical circumstance in which the facts before that court, if altered slightly, "might" give rise to a reasonable inference supporting demand futility, we do not find it persuasive under our facts. Here, the NPA's Statement of Facts stated that employees of four Tenet hospitals in Georgia and South Carolina created contractual agreements with Clinica as a "pretextual mechanism" to make illegal payments in exchange for patient referrals, "concealed material facts from Tenet lawyers and outside counsel because they knew that the agreements would not be approved if the true nature of the Clinica arrangements were disclosed to the lawyers," and facilitated payments to Clinica "in violation of then-existing company policies and controls governing the disbursement of monies to referral sources." Appellants argue "[t]here is no reason to believe that [the CIA's] level of scrutiny would be frustrated because some executives concealed facts

sometimes, or made substantial payments to Clinica without proper documentation," and, moreover, "the Statement of Facts gives every indication that Tenet's lawyers independently acquired information, strongly supporting an inference that the Board was made aware of the Clinica issues—yet the Board members either consciously disregarded their duty to review those contracts or chose inaction regarding [Tenet's violations]." But appellants point to no particularized facts supporting those suggested inferences.[8] *See id.* at *12 ("Even reasonable inferences 'must logically flow from particularized facts alleged by the plaintiff.'").

Appellants also contend that the inference that the CIA's requirements would have brought the continuing misconduct regarding Clinica to the Board's attention is compelling because "[w]here there is a corporate governance structure in place, we must then assume the corporate procedures were followed and that the board knew of the problems and decided no action was required." (quoting *In re Abbott Labs. Derivative S'holders Litig.*, 325 F.3d 795 (7th Cir. 2003)). Although *Abbott Labs* purported to apply Delaware law, the statement appellants quote has not been

---

[8] Appellants also cite *In re McKesson Corp. Derivative Litigation*, No. 17-cv-01850-CW, 2018 WL 2197548 (N.D. Cal. May 14, 2018), a case based on *Horman*'s reasoning. In *McKesson*, the corporation entered into a 2008 DOJ settlement that required it to implement a controlled-substance monitoring program. The court found the shareholders' allegations sufficient to establish demand futility where certain directors "continued a pattern of noncompliance" after the corporation settled. *Id.* at *10. Specifically, the audit committee failed to take action even after receiving "regular signals" during at least five meetings that the monitoring program it had established in connection with the settlement "was failing and required more attention." *Id.* at *7–10. *McKesson*'s "strong factual allegations of board knowledge of ongoing legal violations in the wake of federal government enforcement proceedings" distinguish that case from the one before us. *See Rojas on behalf of J.C. Penney Co., Inc. v. Ellison*, No. 2018-0755-AGB, 2019 WL 3408812, at *13 (Del. Ch. July 29, 2019) (mem. op.) (distinguishing *McKesson* because "[f]actual allegations of this nature are precisely what is missing here").

adopted or recognized as correct by any Delaware (or Nevada) court and, in fact, has been specifically rejected or distinguished by several other jurisdictions applying Delaware law.[9] We do not find *Abbott Labs* instructive. *See Horman*, 2017 WL 242571, at *9 (rejecting "bald allegation that directors bear liability where a concededly well-constituted mechanism, having received no specific indications of misconduct, failed to discover fraud"); *see also Connolly*, 257 S.W.3d at 851 (rejecting *Abbott Labs*-based argument that Delaware law allows knowledge of alleged defects in company's internal controls and alleged violations to be "imputed generally" to company's directors).

Appellants further argue that "the size and duration of the Clinica kickback scheme also supports the reasonable inference that Defendants . . . had knowledge of the scheme." Specifically, appellants contend (1) "[t]he scheme spanned over a

---

[9] *See Cottrell on behalf of Wal-Mart Stores, Inc. v. Duke*, 829 F.3d 983, 993 (8th Cir. 2016) (rejecting shareholders' *Abbott Labs* argument because "[t]he shareholders take that line out of context" and "the court [in *Abbott Labs*] did not simply infer that knowledge based on the 'assum[ption]' that 'corporate governance procedures were followed,' as the shareholders' quotation might suggest in isolation," but "[t]o the contrary, the court repeatedly listed other specific factual allegations establishing the directors' awareness"); *In re First Solar Derivative Litig.*, No. CV-12-00769-PHX-DGC, 2016 WL 3548758, at *9 (D. Ariz. June 30, 2016) (refusing to "conclude that the existence of internal risk management procedures allows the Court to infer that the continuing outside directors each knowingly chose not to disclose the [complained-of] defect" because, regardless of the language used in *Abbott Labs*, that case "included many factual allegations in addition to the corporate governance structure" and "[w]ith such detailed allegations, little inference was required to conclude that the board members knew of the non-compliance problems"); *cf. In re Pfizer Inc. S'holder Derivative Litig.*, 722 F. Supp. 2d 453, 461–62 (S.D.N.Y. 2010) (noting "the Complaint detail[ed] at great length a large number of reports made to members of the board," including "reports to the board of the Neurontin and Genotropin settlements, a large number of FDA violation notices and warning letters, [and] several reports to Pfizer's compliance personnel and senior executives of continuing kickbacks and off-label marketing," and concluding "[t]here is no reason to believe [the CIA's] reporting requirement was not fully complied with, thus guaranteeing that each member of the board was bombarded with allegations of continuing misconduct of the very kind that the prior settlements looked to the board to prevent," and "[i]n such circumstances, nothing in either federal or Delaware law holds it insufficient for individual directors' knowledge and liability to be pleaded inferentially" (citing *Abbott Labs*, 325 F.3d at 806)).

decade—from 2000 through 2013—and subsumed the entire five-year term of the 2006 CIA"; (2) "[d]uring that time, Tenet paid Clinica bribes and kickbacks totaling over $12 million," which "allowed Tenet to collect more than $145 million in unlawful Medicare and Medicaid funds"; and (3) "the Audit Committee would have been watching this issue closely given the $900 million price tag of the previous compliance failures." According to appellants, "in assessing the magnitude and duration of the alleged wrongdoing, this Court should bear in mind not only Tenet's millions of dollars in bribes and kickbacks, and its $145 million in tainted revenues, but also the far-greater risks of enormous liability to which these wayward fiduciaries exposed Tenet—risks that resulted in a second fine of $513 million to resolve its . . . liability for defrauding the United States and paying bribes to Clinica in exchange for patient referrals."

Though "magnitude and duration may be probative of whether the Board knew or should have known about a violation of the law," these factors "will rarely suffice in their own right to satisfy Rule 23.1's requirement in this context that plaintiffs allege with particularity actual or constructive board knowledge." *In re SAIC Inc. Derivative Litig.*, 948 F. Supp. 2d 366, 387 (S.D.N.Y. 2013) (applying Delaware law); *accord Cottrell*, 829 F.3d at 996. Here, the alleged wrongdoing involved four Tenet hospitals out of about seventy-seven. And while the $513-million fine imposed after the improper conduct came to light is not insubstantial, appellants do not dispute appellees' assertion that $145 million—the "tainted"

revenue—"is the equivalent of approximately 1.3% of Tenet's operating revenues for 2013 alone." Without minimizing the alleged wrongdoing here, we conclude the "magnitude and duration" of the alleged "scheme" do not, "in their own right" or in concert with appellants' other allegations, support a reasonable inference of board knowledge. *See SAIC*, 948 F. Supp. 2d at 387; *Cottrell*, 829 F.3d at 996; *see also Horman*, 2017 WL 242571, at \*14–15 & n.91 (considering ratio of UPS's illegal shipments to its overall operations in rejecting shareholders' "magnitude and duration" argument); *In re Chemed Corp., S'holder Derivative Litig.*, No. 13-1854-LPS-CJB, 2015 WL 9460118, at \*14 (D. Del. Dec. 23, 2015) ("The allegations in the Complaint do span a lengthy period of years. Yet while that is so, and while the allegations are otherwise long on describing misconduct of Vitas and/or Chemed executives, they are short on particularized facts indicating that Board members were aware of any such misconduct and failed to take action.").

On this record, we conclude appellants did not meet their burden to "adequately plead demand futility with particularized facts." *See Brick*, 351 S.W.3d at 604; *Connolly*, 257 S.W.3d at 840; *see also Horman*, 2017 WL 242571, at \*12 ("[O]ur Supreme Court has made clear that 'conclusory allegations are not considered as expressly pleaded facts or factual inferences.' Even reasonable inferences 'must logically flow from particularized facts alleged by the plaintiff.'"). Consequently, the trial court did not abuse its discretion by granting appellees'

special exceptions and dismissing appellants' petition with prejudice. *See Connolly*, 257 S.W.3d at 838.

We decide appellants' two issues against them and affirm the trial court's judgment.

/Cory L. Carlyle/
CORY L. CARLYLE
JUSTICE

Molberg, J., dissenting without opinion

190260F.P05



## Court of Appeals
## Fifth District of Texas at Dallas
## JUDGMENT

CITY OF WARREN POLICE AND
FIRE RETIREMENT SYSTEM
AND JANICE STEWART,
Appellants

No. 05-19-00260-CV      V.

TENET HEALTHCARE
CORPORATION, JAMES A.
UNRUH, RONALD A.
RITTENMEYER, BRENDA J.
GAINES, KAREN M. GARRISON,
RICHARD R. PETTINGILL, J.
ROBERT KERREY, EDWARD A.
KANGAS, FREDA C. LEWIS-
HALL, TAMMY ROMO,
MATTHEW J. RIPPERGER,
RANDOLPH C. SIMPSON,
TREVOR FETTER, DANIEL
CANCELMI, R. SCOTT RAMSEY,
J. MCDONALD WILLIAMS, JOHN
ELLIS BUSH, AND BIGGS C.
PORTER, Appellees

On Appeal from the 14th Judicial
District Court, Dallas County, Texas
Trial Court Cause No. DC-16-15118.
Opinion delivered by Justice Carlyle.
Justices Molberg and Browning
participating.

In accordance with this Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

It is **ORDERED** that appellees Tenet Healthcare Corporation, James A. Unruh, Ronald A. Rittenmeyer, Brenda J. Gaines, Karen M. Garrison, Richard R. Pettingill, J. Robert Kerrey, Edward A. Kangas, Freda C. Lewis-Hall, Tammy

Romo, Matthew J. Ripperger, Randolph C. Simpson, Trevor Fetter, Daniel Cancelmi, R. Scott Ramsey, J. McDonald Williams, John Ellis Bush, and Biggs C. Porter recover their costs of this appeal from appellants City of Warren Police and Fire Retirement System and Janice Stewart.

Judgment entered this 28th day of September, 2020.